(700 P.2d 585)

No. 56,810

AMY RUTH PETERSON, *Appellant*, v. CHARLES D. PETERSON, *et al.*, *Appellees*.

Opinion filed May 31, 1985.

*Steven W. Rogers*, of Fredonia, for the appellant.

*Raymond W. Radford*, of Chanute, for the appellees.

Before FOTH, C.J., RICHARD W. WAHL, District Judge, Assigned, and J. PATRICK BRAZIL, District Judge, Assigned.

WAHL, J.: The issues in this case grew from the execution of

four irrevocable trust instruments and a power of attorney, also denominated as being irrevocable.

In October of 1981, Charles D. Peterson, appellee, visited the home of his mother, Amy Ruth Peterson, appellant. At that time he went through some of his mother's financial papers and discovered that several stock certificates were missing. Mrs. Peterson indicated that she needed some help in managing her financial affairs.

Charles returned to his mother's home in November, 1981. During that visit he spoke with the president of the bank and consulted with the bank's attorney, Laurel McClellan, who was also Mrs. Peterson's personal attorney, as to ways of providing for Mrs. Peterson's financial security, including trusts or a conservatorship. They concluded that the best method would be to create an irrevocable power of attorney in Charles and a series of irrevocable trusts.

Mrs. Peterson, who was in her mid-80's at the time the trusts were signed, lived on a farm near Fredonia with her two half-brothers, Gilbert and Alva Boice, and her half-sister, Oneta Boice. The Boices had lived with and worked with the Petersons for over thirty years. The documents signed by Mrs. Peterson created four trust agreements—one solely for herself, and one each for the benefit of herself and Gilbert, Alva and Oneta respectively. The trusts provided that Mrs. Peterson should be entitled to the interest income from the trusts for her lifetime; that Gilbert, Alva and Oneta would each be entitled to the interest income from their respective trusts from the inception of the trust until their deaths; that the trustee, in his discretion, could invade the corpus of the trust for the care, maintenance, support and comfort of the settlor or the beneficiaries; and that, upon their deaths, the trust corpus should pass equally to Charles D. Peterson and Maxine Copeland, the children of Mrs. Peterson.

The testimony at the trial was sharply divided on the issue of whether the documents were explained to Mrs. Peterson and the Boices. Charles testified that he discussed the agreements with Mrs. Peterson and the Boices the night before they were signed and that everyone agreed that it was a good way to manage the estate. Gilbert and Alva deny that it was discussed with them. Gilbert, Charles and Mrs. Peterson went to the bank the next morning to execute the documents. Charles testified that he

briefly explained what the documents were, and Laurel McClellan, the attorney who drafted the documents, testified that he explained the documents to Mrs. Peterson, gave them to her one at a time to sign, and answered all of her questions about them. He testified that he had no doubt that she knew what she was signing and understood that the power of attorney and the trust agreements were irrevocable.

On December 16, 1981, Amy Ruth Peterson filed a petition in the district court asking that the power of attorney and the four trust instruments be nullified. In her petition, Mrs. Peterson asserts that she was not given an opportunity to read the documents or to consult an attorney regarding the terms or possible consequences or effects of her executing the documents. She further claims that she was not advised that the instruments were irrevocable.

The district court ruled in favor of the defendants after finding that Mrs. Peterson understood the provisions of the power of attorney and of the four trusts and that she knowingly, understandingly and voluntarily signed the instruments. Amy Ruth Peterson appeals from that decision.

In this case, there is no dispute that the trust instruments reserved no power of revocation and by their clear and unambiguous terms were irrevocable. Generally, a private express trust cannot be revoked or amended by the grantor unless that power is reserved. K.S.A. 58-2417. *State Bank of Parsons v. First National Bank in Wichita*, 210 Kan. 647, 504 P.2d 156 (1972). Where that power is not retained, a grantor will be entitled to revoke the trust only on a showing of fraud, mistake, or some other ground that allows a gift or contract to be rescinded.

In this case, the plaintiff argues that she did not fully understand what she was signing at the time she signed the trust instruments. There is no allegation that she lacked the capacity to create express irrevocable trusts at the time the trust agreements were signed. She argues, however, that equity will set aside a trust "where it is not the pure, voluntary, well understood act of the grantor's mind." 89 C.J.S., Trusts § 85, p. 877. While that is a correct statement of the law, it is also true that "in the absence of fraud, mistake, duress, undue influence, or other matters cognizable in equity, a trust will not be set aside where it has been voluntarily executed. It is no ground for setting aside a

trust entered into voluntarily that the settlor dislikes it and is sorry he executed it." 89 C.J.S., Trusts § 85, p. 876.

Whether Amy Ruth Peterson was competent to execute the trusts and did so knowingly and voluntarily are questions of fact which the trial court resolved against the contentions of the appellant. If there is competent, substantial evidence to support that finding by the trial court, this court will not disturb it. That there may have been evidence from which the trial court could have made different findings and conclusions is of no consequence.

Charles Peterson testified that his mother requested his assistance in managing her financial affairs, that the nature of the trust agreements was explained to her and the rest of the family the night before they were executed, and that the trusts were again explained to her at the bank when they were signed. McClellan testified that he explained to her that the trusts were irrevocable, how the interest and corpus of the trusts could be used, and that the trust corpus would eventually pass to her legal heirs. He also indicated that he answered all of her questions about the operation of the trust instruments.

It was the function of the trial court to weigh the evidence and determine the credibility of the witnesses. Substantial and competent evidence supports its conclusion that the signing of the trust instruments was voluntary, with full understanding and knowledge of the efficacy of those instruments.

It bears comment by this court that Mrs.Peterson argues that the omission of a provision for revocation is indicative of her misunderstanding of the instrument and should be viewed as a circumstance of suspicion so that very slight evidence of mistake or misunderstanding is sufficient to invalidate the trust. The effect of the omission of a power to revoke must be viewed in light of the facts and circumstances of each case. In 89 C.J.S., Trusts § 90, p. 917, it is stated:

"The absence of the power of revocation will not invalidate the trust where revocability would defeat the purpose of the trust. For example, the absence of the power does not invalidate the trust where the purpose of the trust is to provide against the settlor's own improvidence, or against his inability, because of age or infirmities, to care for his property, or where it is evident that the trust is to continue during the settlor's life."

Here, the trusts were created precisely for the purpose of protecting Mrs. Peterson from her own improvidence or inability

to manage her financial affairs because of her age. Revocability in this circumstance would defeat the purpose of the trusts and the failure to include a power of revocation in the trusts cannot be deemed indicative of mistake or misunderstanding.

The appellant also argues that Laurel McClellan, the scrivener of the instruments, was retained by Charles and that the lack of independent legal advice before she signed the documents constitutes grounds for setting aside the trusts and power of attorney. The rule concerning independent advice is generally applied in Kansas only when the beneficiary of a trust stands in a confidential or fiduciary relationship to the settlor, and "when that relationship is used by one of the parties to take advantage of the other for financial gain . . . the law throws around such other its protecting arm to see that no undue advantage has been taken of the donor, and if the circumstances warrant, requires a showing of independent advice." *Jernberg v. Evangelical Lutheran Home for the Aged*, 156 Kan. 167, 173, 131 P.2d 691 (1942); *In re Estate of Carlson*, 201 Kan. 635, 443 P.2d 339 (1968); *Olson v. Harshman*, 233 Kan. 1055, 668 P.2d 147 (1983).

"Where the trust entered into voluntarily is for the benefit of the settlor and his children without any benefit accruing to the trustee, failure to obtain independent legal advice is no ground for cancellation." 89 C.J.S., Trusts § 85, p. 877.

In this case, it is not alleged that Charles Peterson and his mother stood in a confidential or fiduciary relationship, nor is it alleged that he exerted undue influence on her or coerced her into signing the documents. Charles Peterson sought the advice of an attorney, but the attorney was the same one consulted on other occasions by Mrs. Peterson. The instruments were explained to Mrs. Peterson by Mr. McClellan. He answered all of her questions and there is no showing that she requested any further legal advice. Mrs. Peterson did have some familiarity with powers of attorney since she had previously had a power of attorney in herself for her husband prior to his death. Nothing in this case would warrant the application of the principle of independent legal advice. *Frame, Administrator v. Bauman*, 202 Kan. 461, 449 P.2d 525 (1969). The trial court did not err in finding that the lack of independent legal advice would not invalidate the trusts.

Plaintiff next argues that in Kansas a "durable" power of attorney remains in effect, if the proper wording is used, even if

the person giving the power of attorney becomes incapacitated, K.S.A. 58-610 *et seq.*, but that an "irrevocable" power of attorney would violate public policy and cannot exist.

A power of attorney is defined in 2A C.J.S., Agency § 44, p. 612, as "an instrument in writing by which one person, as principal, appoints another as his agent and confers upon such agent the authority to act in the place of the principal for the avowed purposes set forth in the instrument." The general rule of agency is that "[t]he power to revoke an agent's authority at any time is not affected by the fact that there is an express or implied contract between the agent and the principal that such agency is irrevocable . . . ." 2A C.J.S., Agency § 111, p. 728. Since it is deemed contrary to public policy to have an agent forced on a principal against his will, unless a power of attorney is coupled with an interest, it is revocable by the principal at will. The interest of the agent is subject to a reserved power of revocation which is implicit in the power of attorney. *Bowen, Administrator v. Hathaway,* 202 Kan. 107, 114, 446 P.2d 723 (1968).

In order to render effectual the termination of an agency, notice of the termination must be given to the affected parties. *George v. Bolen-Williams, Realtors,* 2 Kan. App. 2d 385, 391, 580 P.2d 1357 (1978). Amy Ruth Peterson filed the petition in this case on December 16, 1981, and prayed for the revocation of this power of attorney. If that was not adequate notice of revocation, and we think that it was, she then gave notice of revocation by separate written statement on September 3, 1982. This power of attorney qualified as a durable power of attorney under K.S.A. 58-610 *et seq.*, which has nothing to do with its revocation but provides that it shall continue in effect if the principal becomes incapacitated. The capacity of Amy Ruth Peterson was never questioned and so was never an issue in this litigation. She could, and did, revoke this power of attorney by the filing of the petition herein, and the district court erred in holding the power of attorney to be irrevocable.

The judgment of the trial court is affirmed as to the irrevocable trust instruments and is reversed as to the power of attorney and remanded with direction to find the power of attorney revoked.