# PRODUCTION CREDIT ASSOCIATION OF MADISON, Plaintiff-Respondent,

v.

Sylva KEHL, individually and as personal representative of the Estate of Clarence Kehl, Deceased, Defendant-Appellant,

Donald E. KEHL, a/k/a Donald Kehl, and the State of Wisconsin, Department of Revenue, Defendants.†

Court of Appeals

*No. 87-1355. Submitted on briefs November 7, 1988.—Decided December 8, 1988.*

(Also reported in 434 N.W.2d 816.)

† Petition to review denied.

For the defendant-appellant the cause was submitted on the briefs of *William J. Rameker* and *Christopher J. Brown* and *Murphy & Desmond, S.C.,* of Madison.

For the plaintiff-respondent the cause was submitted on the brief of *Francis J. Eustice* and *Shari L. LePage* and *Brill & Eustice, S.C.* of Sun Prairie.

Before Gartzke, P.J., Eich. and Sundby, JJ.

EICH, J. Sylva Kehl, individually and as personal representative of the estate of Clarence Kehl, appeals from a judgment foreclosing a real estate mortgage on a farm owned by the estate. The dispositive issue is whether foreclosure will lie where the underlying mortgage was obtained pursuant to a power of attorney executed by an incompetent person. We answer the question in the negative and reverse the judgment.

The facts are not in dispute. Sylva Kehl and her husband, Clarence, operated a turkey farm in Columbia County. The farm was owned solely by Clarence, who had purchased part of it from his father. In 1981, the Kehls' son Donald took over the farm, and in order to finance 1982 operations he applied for a loan renewal from the Production Credit Association (PCA) in the amount of $453,000. PCA had extended credit to the senior Kehls in the past, and its loan officer, Gail Hill, informed Donald that PCA would require a mortgage on the farm before the loan could be approved.

Hill was aware that Clarence Kehl was suffering from Parkinson's disease, and when the time came to execute the loan documents, Donald and Sylva told her that Clarence was hospitalized and would be unable to come in and sign the papers. Hill then suggested that

Sylva obtain Clarence's power of attorney so she could execute the documents in his absence.

Sylva got a power of attorney form from her attorney, Randall Lueders, and took it to the hospital on March 8, 1982. She testified that Clarence "was very much confused" and she "didn't know what to do," and that he "wasn't able to read any of [the form] ...." According to Sylva, she attempted to explain the form to him, "but he wasn't able to comprehend what [she] was talking about." She stated that she then "guided his hand" on the paper in order to form the signature. Sylva dated the form and returned it to Lueders, who notarized the document. Lueders acknowledged at trial that he did not in fact witness Clarence's signature.

Clarence's treating physician, Dr. Ralph Poser, testified that Clarence's Parkinson's disease was in an advanced state, and that he also suffered from depression and from cancer of the prostate, which had spread throughout his body. Dr. Poser stated that Clarence's illnesses, and the drugs he was taking to treat them, all contributed to diminish his mental faculties to the point of incompetency. Poser testified that, in his medical opinion, Clarence was "mentally incompetent" on March 8, 1982.

Several weeks later Donald and Sylva executed the loan documents at Hill's office. Sylva signed both her name and Clarence's to the loan agreements as "co-signers." She also signed the real estate mortgage for herself and for Clarence. It is undisputed that Hill was not advised by Sylva or Donald, and had no independent knowledge from any other source, that Clarence was incompetent.

Clarence died a few months later and Sylva was appointed personal representative of his estate. Donald eventually defaulted on the loans and was unable to

cure the default. PCA then brought this action to foreclose the mortgage on Clarence's property. Sylva, representing Clarence's estate, contended that because the power of attorney was void, so were the loan documents based upon it, and, as a result, PCA could not enforce the mortgage against the estate. The trial court disagreed, concluding that Sylva was "estopped" from claiming that the mortgage was invalid, and entered judgment in favor of PCA.

The trial court's decision, and PCA's argument on appeal, assert that Sylva should be estopped from denying the validity of the mortgage on general equitable principles—that "it would be unconscionable to permit a person to maintain a position inconsistent with one in which he [or she] has ... accepted any benefit." We see two problems with that analysis. First, it is the estate, not Sylva personally, whom PCA seeks to estop. Thus, whether Sylva herself received any benefit from the mortgage is immaterial. Second, even if her "benefits" are relevant, there is no evidence that Sylva benefited in any way from PCA's acceptance of the mortgage. PCA appears to concede this point, for it has not referred us to any testimony or exhibits in the record establishing any benefit to either Sylva or Clarence. Instead, PCA asks us to "conclude" that they received income from Donald's farming operations because of "the lack of evidence [that they had] other means of support." But facts are established by proof, not by the lack of proof.

We note, too, that the import of the appeal is not to release Sylva from whatever personal liability she may have for the PCA loans, but only to relieve Clarence's estate from liability under the real estate mortgage. And the fact is that Sylva had no ownership interest in the mortgaged property; it was Clarence's alone. And

while Sylva did sign the mortgage in her own name, she also signed it as Clarence's agent, or "attorney in fact"; and it is on this basis that PCA is attempting to enforce the mortgage against Clarence's estate. Because of Clarence's incompetence, however, and the manner in which the power of attorney form was "signed"—by Sylva's tracing the signature with Clarence's hand—she never became his agent or attorney in the first place.

A power of attorney is generally recognized as "creat[ing] an agency relationship" in which "the authority and duties of [the] attorney in fact are governed by the principles of the law of agency." *In re Estate of Lienemann,* 382 N.W.2d 595, 602 (Neb. 1986). *See also Peterson v. Peterson,* 700 P.2d 585, 589 (Kan. Ct. App. 1985); *King v. Bankerd,* 492 A.2d 608, 611 (Md. Ct. Spec. App. 1985); *McKinney v. King,* 498 So. 2d 387, 388 (Miss. 1986); *State v. Kennedy,* 296 A.2d 65, 66–67 (N.J. 1972); *Matter of Estate of Mehus,* 278 N.W.2d 625, 629 (N.D. 1979); *Kanawha Valley Bank v. Friend,* 253 S.E.2d 528, 530 (W. Va. 1979). And an agency is a personal relationship which "cannot exist after the death or incapacity of the principal ...." Restatement (Second) of Agency sec. 120, comment a at 305 (1958). Just as the principal's death terminates the agency, so does his or her loss of capacity. *Id.,* sec. 122 comment b at 309. Indeed, because it is a consensual relationship, the principal "must have capacity to give a legally operative consent" in order for an agency to be created. *Id.,* sec. 20 comment b at 91.

In this light, it was held long ago that "a power of attorney executed by an insane person, or one of unsound mind, is absolutely void." *Dexter v. Hall,* 82 U.S. 9, 26 (1873). While more recent cases have come to regard contracts by incompetents as voidable, rather than void, it is a distinction without a difference as far

229

as this case is concerned, for it is undisputed that Clarence Kehl was incompetent at the time Sylva took the printed power of attorney form to his hospital room. As a result, whether that document is described as "void" or "voidable" is of no consequence.

A "voidable" contract is one in which one of the parties—an infant or an incompetent, for example—has the power to validate under certain circumstances, or to avoid entirely. 1 Corbin on Contracts sec. 6, at 14 (1963). To avoid the contract, all that need be established is the fact of the party's infancy or incompetency on the date the instrument was executed. *Id.* at 13. Here, the evidence on the point—Sylva's testimony as to Clarence's total lack of comprehension, and his inability even to sign his name on the day in question, and Dr. Poser's medical opinion that he was mentally incompetent on that date—is persuasive, and it is uncontradicted in the record.

Thus, if the document was void at its inception, it was void for all time; and if it was merely voidable, it has been voided by the evidence of Clarence's incompetency. As a result, questions of estoppel—PCA's primary argument on the appeal—do not arise. The purported power of attorney is a nullity, and because any liability on the part of Clarence's estate for the PCA mortgage is dependent on the existence and validity of that power of attorney, the trial court's judgment cannot stand.

*By the Court.*—Judgment reversed and cause remanded with directions to dismiss the plaintiff's complaint.