No. 117,499

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JOHN A. MOORE and JOYCE E. MOORE TRUST,
JOYCE E. MOORE, Trustee, and JOYCE E. MOORE, Individually,
*Appellants*,

v.

JEBIDIAH MOORE and STEVEN L. MOORE,
*Appellees*.

SYLLABUS BY THE COURT

1.

Principles governing appellate review of errors in jury instructions are stated and applied.

2.

When parties occupy a confidential relationship, the courts require the trusted party to prove the absence of undue influence over the trusting party in bargaining and contract formation.

3.

In a will contest, unlike a contract dispute, the burden to prove the absence of undue influence shifts to a legatee only when he or she occupied a confidential relationship with the testator and the bequest invites suspicion.

4.

Kansas appellate courts have declined to fashion an overarching definition of confidential relationships and defer, instead, to an inquiry into the particular facts of a given case.

5.

Whether a contracting party has been unduly influenced presents a question of fact turning upon the particulars of the transaction. Undue influence requires that degree of pressure sufficient to overpower the party's free will. A fact-finder should consider all the circumstances, including the relationship of the parties; the timing and manner of suggestion, advice, or other pressure; the motive for applying that pressure; and the effect of the pressure.

6.

The party alleging error on appeal must furnish a record that supports the claimed mistakes. When there are blanks in the record, appellate courts do not fill them in by making assumptions favoring the party claiming error in the district court.

7.

District courts generally have broad authority in remedying lawyer error or misconduct during trial. Appellate courts typically apply an abuse of discretion standard to those remedial decisions.

8.

Individuals with the mental capacity to enter into contracts may still be unduly influenced to agree to things they otherwise would not, thereby rendering any contract void.

9.

Lack of capacity and undue influence are equitable rather than legal claims in that they effectively void or rescind a contract rather than yield money damages for breach. Rescission is an equitable remedy. A party asserting an equitable claim and seeking equitable relief typically is not entitled to a jury trial as a matter of right.

Appeal from Brown District Court; KIM W. CUDNEY, judge. Opinion filed August 24, 2018. Affirmed in part, reversed in part, and remanded with directions.

*Michael R. Ong* and *Caroline Ong*, of Ong Law Firm, P.A., of Overland Park, for appellants.

*John W. Fresh*, of Farris & Fresh Law Offices, of Atchison, for appellees.

Before ATCHESON, P.J., PIERRON and STANDRIDGE, JJ.

ATCHESON, J.:

SUMMARY OF CASE AND DISPOSITION

The central issue in this case turns on whether Steven Moore manipulated John and Joyce Moore, his parents, to part with land they owned, thereby gutting a trust they had set up as an estate plan to benefit all four of their children. Joyce contends Steven beset John on his deathbed and exploited her depleted physical and emotional condition to get them to sign a contract selling their homestead to his son (and their grandson) Jebediah Moore. She says that several months later Steven improperly induced her to sell farmland to Jebediah. Those two contracts enabled Jebediah to acquire real estate worth $1.4 million with a down payment of $25,000 and an agreement to pay Joyce and the trust an additional $377,000 over as long as 30 years at nominal interest. Those

3

transactions left Joyce with little of immediate value to pass on to her other children or grandchildren.

Joyce and the trust she and John established sued Steven and Jebediah in Brown County District Court in September 2015 to set aside the two contracts. Joyce and the trust have been jointly represented throughout this case and are united in legal interest, so from here on we dispense with repeated references to the trust as a distinct party. Steven and Jebediah are similarly unified in their defense, and the evidence points to Steven as the driving force behind the transactions. At trial, about a year later, Joyce specifically claimed that she and John lacked the capacity to enter into the contract for the homestead and she lacked the capacity to sell the farmland. She pressed an alternative claim that the contracts should be set aside because Steven exerted undue influence over John and her after cultivating their confidence that he would look out for their best interests. The jury considered four specific claims: (1) Whether John and Joyce had the capacity to enter into the contract to sell their homestead to Jebediah; (2) whether Joyce had the capacity to enter into the contract to sell farmland to Jebediah; (3) whether Steven unduly influenced John and Joyce to sell their homestead to Jebediah; and (4) whether Steven unduly influenced Joyce to sell farmland to Jebediah.

As we explain, the district court incorrectly instructed the jury in a way materially disadvantaging Joyce on her undue influence claims, rendering its verdicts in favor of Steven and Jebediah on that theory deficient. We, therefore, reverse that part of the judgment the district court entered for Steven and Jebediah and remand the case with directions. On appeal, Joyce also disputed the jury verdicts for Steven and Jebediah on the claim she and John lacked the capacity to enter into the contracts. We find her arguments do not require reversal of those verdicts and affirm that part of the judgment.

Because Joyce pursued equitable claims rooted in upending the contracts rather than legal claims for monetary damages and Steven and Jebediah asserted no

4

counterclaims, no one was entitled to a jury trial as a matter of right then or now. The parties were and are owed a fair hearing of their dispute in front of the district court sitting as the finder of fact—that is, in a bench trial. On remand, a new trial is unnecessary. The district court should promptly make findings of fact and conclusions of law resolving Joyce's undue influence claims based on the evidence admitted during the jury trial and consistent with this opinion. That directive corrects for the erroneous jury result and affords the parties the fact-finding they have always been procedurally due.

REVERSIBLE INSTRUCTIONAL ERROR ON UNDUE INFLUENCE

*District Court Mishandled Burden of Proof of Undue Influence*

The district court committed reversible error in instructing the jurors on the law applicable to the claims the contracts should be set aside because Steven exerted undue influence over John and Joyce. As we explain, the error deprived Joyce of fair consideration of her contention that Steven should have been required to prove the absence of undue influence. Had the burden of proof been shifted to Steven, the jurors reasonably could have reached a different conclusion.

We begin with the test for assessing instructional error, since that drives how we review the evidence. As the party asserting the jury had been erroneously instructed, Joyce must show:  (1) she raised and preserved the instructional issue in the district court; (2) she requested the jury be instructed on a legally appropriate matter; and (3) the facts supported giving the instruction. *Foster v. Klaumann*, 296 Kan. 295, 301-02, 294 P.3d 223 (2013). With that showing, an appellate court may conclude the district court erred in failing to instruct the jury on the particular point. The appellate court must then consider whether the error can be discounted as harmless. Here, we assume the applicable standard of review on harmlessness to be the one for an instructional error impinging on a nonconstitutional right of the complaining party. Steven and Jebediah would be entitled

5

to no more favorable a standard. As the parties benefiting from the error, they have to establish there was "'no reasonable probability'" the instructional foul-up contributed to verdicts in their favor. 296 Kan. at 305 (harmlessness standard for error not implicating constitutional right) (quoting *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 [2011]); accord *Siruta v. Siruta*, 301 Kan. 757, 771-72, 348 P.3d 549 (2015) (burden of proving harmlessness); *State v. Williams*, 295 Kan. 506, 516, 286 P.3d 195 (2012) (burden of proving harmlessness).

### 1. Issue Preservation

Joyce requested an instruction informing the jury that when one party to a contract has placed confidence or trust in the other party, the party in whom that trust or confidence has been reposed bears the burden of proving the contract was not the product of undue influence. In a case such as this, that reverses the typical allocation of proof, since the party seeking relief from a contract typically would be required to prove undue influence. Joyce specifically asked the district court to instruct the jury on that legal principle and offered a proposed instruction. The district court's instructions failed to give the jurors meaningful guidance on the point. Joyce sufficiently raised the issue in the district court to preserve any error for appellate review.

### 2. Legal Appropriateness

Kansas courts have long recognized that contracts between parties in a confidential or fiduciary relationship require particular scrutiny should their fairness be challenged. The danger, of course, lies with the party in whom trust has been placed and his or her ability to exploit the relationship to gain unfair advantage in any transaction with the other party. As an antidote, the courts have required the trusted party to prove the absence of undue influence over the trusting party in bargaining and contract formation. *Frame, Administrator v. Bauman*, 202 Kan. 461, 467, 449 P.2d 525 (1969);

6

*Smith v. Smith*, 84 Kan. 242, 244-45, 114 P. 245 (1911). In effect, the courts presume undue influence in contracts between parties occupying a confidential relationship. The *Frame* court captured the rule this way:  When parties occupying a confidential relationship enter into a contractual transaction, "the burden rests upon the person [in whom confidence has been placed] to show that the transaction was conducted in good faith and did not result from the exercise of undue influence." 202 Kan. 461, Syl. ¶ 5; see *Curtis v. Freden*, 224 Kan. 646, 651, 585 P.2d 993 (1978) (recognizing rule and citing *Frame*); PIK Civ. 4th 124.09 Comment (noting ruling). The principle bears obvious legal relevance to Joyce's allegations attacking the contracts.

Kansas courts, however, apply a different rule to wills and other testamentary instruments. If the recipient of a bequest in a will had a confidential or fiduciary relationship with the testator, a court should presume undue influence when "suspicious circumstances" surround the making of the will. *Cresto v. Cresto*, 302 Kan. 820, 833-34, 358 P.3d 831 (2015). So in a will contest, unlike a contract dispute, the burden to prove the absence of undue influence shifts to a legatee only when he or she occupied a confidential relationship with the testator *and* the bequest invites suspicion.

As we discuss, the district court failed to appreciate the differing rules governing contracts and wills involving parties occupying confidential relationships. And that likely contributed to the instructional error. In any event, an instruction or instructions addressing confidential relationships between contracting parties and the burden of proof on undue influence in those circumstances were legally appropriate here.

### 3. Factual Appropriateness

In assessing the sufficiency of the factual basis for an instruction, both the district court in the first instance and this court on appellate review must look at the record in the

7

best light for the party asking for the instruction, here Joyce. *Foster*, 296 Kan. at 301. We summarize the evidence that way.

As they grew older, John and Joyce set up a trust that provided for the disposition of three quarter sections of land they owned in Brown County, including farmland and the house they lived in. The trust permitted the surviving spouse to use the house and all of the land. Upon his or her death, the trust assets were to be divided among John and Joyce's four adult children, including Steven.

Steven assisted John in running the family farm and took over more and more of the operation as his parents aged. Jebediah actively participated in the farming business as both a child and an adult. In its final form, the trust directed that upon the deaths of Joyce and John, Steven would receive the quarter section of farmland on which he lived and all the farm equipment. The trust severed John and Joyce's house and about 2 acres of land from the rest of the homestead quarter section and directed that both parcels go to their other children: John W. Moore, Sue Hartter, and Wilma Rainwater. John W., Sue, and Wilma also were to receive the third quarter section of farmland. The trust gave Steven the first right to purchase the farmland from his siblings at a fair market price to be set through an appraisal process. Family members understood the intent behind the trust to be that Steven would continue the farming operation on all the land, thus his first option to purchase any of the farmland his siblings might wish to sell.

At some point, John and Joyce signed powers of attorney for their financial affairs and medical directives naming Steven as the successor to whichever of them died first. In early 2014, John, then 81 years old, was dying of pancreatic cancer. Joyce, then 80 years old, had been caring for him at home with the help of a hospice program. On May 16, Joyce was admitted to a local hospital with fever, chills, and nausea; she was diagnosed as having a severe abdominal infection. Later that day, Steven went to see his father and had him sign a contract selling his and Joyce's house and the surrounding 2 acres to

8

Jebediah for $110,000. The contract called for a down payment of $20,000 with the balance to be paid to John and Joyce in monthly installments over 20 years at 2 percent interest. Steven then took the contract to the hospital and had his mother sign it. John died six days later.

Steven assumed full control of the farming operation and consistent with the power of attorney began handling Joyce's personal finances in addition to those of the business. During the trial, witnesses variously described Joyce as "completely devastated," "distraught," and "grieving" following John's death. Over the next several months, Steven repeatedly told Joyce that she should let Jebediah buy the farmland to preserve the family business and that if she did not, the other children literally could sell the property out from underneath him.

On September 9, Steven, Jebediah, and Joyce went to see a lawyer with the firm that had regularly done work for Joyce and John for about 30 years. The firm had advised John and Joyce on business and personal legal matters, including the trust disposing of their land. The lawyer presented Joyce with a contract to sell the remainder of the homestead quarter section and the third quarter section to Jebediah for $292,000. The contract required a down payment of $5,000 with the balance to be paid to Joyce in annual installments over 30 years at 2 percent interest. Steven, rather than Joyce, had asked the lawyer to prepare the contract. Joyce had not seen the contract before the meeting. And the lawyer did not discuss with Joyce the effect of the sale on the trust. Joyce signed the contract then and there. John W., Sue, and Wilma received no advance notice of the sale.

Through the contracts, Jebediah acquired the two quarter sections, including John and Joyce's home, designated to go to Steven's siblings under the terms of the trust. The only remaining trust asset of substantial value was the quarter section of land designated to go to Steven. The contracts together called for Jebediah to pay $25,000 up front with

9

the balance of $377,000 due in installments to Joyce over 20 to 30 years with 2 percent interest. An appraisal of the quarter sections done in probating John's estate showed one to have a fair market value of $642,000 and the other $768,000. So Jebediah bought real estate worth about $1.4 million for $402,000 with nearly 95 percent of the purchase price due in installments through 2044. By agreeing to the installment arrangements, Joyce personally financed the transactions except for the down payments.

Those facts taken in the best light for Joyce would support a finding that Steven held a position of confidence with John and her. See *Brown v. Foulks*, 232 Kan. 424, 430-31, 657 P.2d 501 (1983) (confidential or fiduciary relationship entails one party "repos[ing] special trust and confidence in [another party] who is in a position to have and exercise influence over the first party"; *Nelson v. Nelson*, 38 Kan. App. 2d 64, 78, 162 P.3d 43 (2007) (same), *aff'd* 288 Kan. 570, 205 P.3d 715 (2009). Steven had assumed significant control of the family farming business—control that deepened as John succumbed to pancreatic cancer and Joyce concentrated on caring for him. After John's death, Steven further insinuated himself into both the business and Joyce's personal finances. More generally, John and Joyce displayed the requisite sort of confidence in Steven both through his involvement in the family business and their trusting him enough to name him in their powers of attorney and medical directives. Jury instructions on confidential relationships and their relevant legal consequences were factually appropriate.

The jurors, therefore, should have been instructed on circumstances creating a confidential or fiduciary relationship *and* that if Steven occupied a position of confidence in dealing with John and Joyce, he and Jebediah bore the burden of proving that either or both contracts were not the result of Steven's undue influence over his parents. The district court did instruct the jurors on the nature of confidential relationships consistent with PIK Civ. 4th 125.01 and the caselaw. But the district court failed to inform the jurors that the burden of proof shifted to Steven and Jebediah if the jurors found

10

confidential relationships. So the lone instruction, as given, provided no meaningful guidance to the jurors in applying Kansas law on contracts between parties in a confidential relationship. The district court erred on this point.

### 4. Harmlessness

We could excuse the error if it were harmless in the sense that the evidence so favored Steven and Jebediah that the jurors would have come to the same conclusion had they been properly instructed. To make that assessment, we review all the trial evidence with no particular deference to either side. *State v. Plummer*, 295 Kan. 156, 168, 283 P.3d 202 (2012). But Steven and Jebediah, as the parties aided by the error, must establish harmlessness. *Siruta*, 301 Kan. at 771-72.

First, the jurors had sufficient evidence to find Steven maintained confidential relationships with John and Joyce predating the contracts, and nothing changed the basic nature of their interaction as the events surrounding the real estate sales unfolded. Steven largely ran the family farm as John's health declined and Joyce focused on caring for her husband in his last illness. After John's death, Steven also managed Joyce's personal finances. Close blood relatives, such as parent and child, may forge confidential relationships through interactions, including financial dealings, that evince one reposing trust in the other. But consanguinity alone is insufficient. See *Estate of Draper v. Bank of America*, 288 Kan. 510, 519, 205 P.3d 698 (2009) ("'confidential relationship'" may arise from "blood relationship" when trust reposed, but parent-child relationship alone not presumptively confidential); *Brown*, 232 Kan. at 432 (real estate transfers between family members may create fiduciary or confidential relationships). Ultimately, the Kansas appellate courts have declined to fashion an overarching definition of confidential relationships and defer, instead, to an inquiry into the particular facts of a given case. *In re Estate of Farr*, 274 Kan. 51, 72, 49 P.3d 415 (2002); *Denison State Bank v. Madeira*, 230 Kan. 684, 691-92, 640 P.2d 1235 (1982). Steven did not aggressively contest the

11

confidential nature of his relationship with John and Joyce, likely a wise tactical decision in light of the evidence.

Second, the instructional error theoretically would be harmless if the trial evidence clearly established Steven did not exert undue influence over John and Joyce with respect to the contracts. Steven didn't dispute the terms of the contracts or the general circumstances under which John and Joyce assented. Rather, he testified that his parents acted knowledgably and independently in selling the homestead to Jebediah and that he did not impermissibly influence Joyce later to sell the farmland to Jebediah. Joyce, however, testified that she felt pressured to sign the contracts. Both Steven and Joyce were interested witnesses with something to gain. See *State v. Scott*, 39 Kan. App. 2d 49, 56, 177 P.3d 972 (2008) ("One of the methods or techniques for attacking the credibility of a witness is to show partiality, including bias, motive, and interest in the outcome."); *Dalton v. Battaglia*, 402 F.3d 729, 735 (7th Cir. 2005) ("[A] witness's potential self-interest in testifying about matters for which he or she has direct knowledge goes to the weight and credibility of the testimony."). A physician testified that after reviewing relevant medical records of John and Joyce, he concluded neither of them likely was sufficiently engaged in May 2014 to make well-informed decisions about major financial matters. Lay witnesses offered varied assessments of John's and Joyce's mental and emotional pliability in May 2014 and Joyce's in September 2014.

Whether a contracting party has been unduly influenced presents a question of fact turning upon the particulars of the transaction. *Frame*, 202 Kan. at 468; *Leppke v. Heier*, No. 108,377, 2013 WL 5187437, at *4 (Kan. App. 2013) (unpublished opinion). The question asks if the party "'exercised his [or her] own free agency and acted voluntarily by the use of his [or her] own reason and judgment.'" *Frame*, 202 Kan. at 468 (quoting *Cersovsky v. Cersovsky*, 201 Kan. 463, 467, 441 P.2d 829 [1968] [quoting *Homewood v. Eggers*, 132 Kan. 256, Syl. ¶ 5, 295 P. 681 (1931)]). Undue influence requires that degree of pressure sufficient to overpower the party's free will. *Cersovsky*, 201 Kan. at 467. The

12

fact-finder should consider all the circumstances, including the relationship of the parties; the timing and manner of suggestion, advice, or other pressure; the motive for applying that pressure; and the effect of the pressure. 201 Kan. at 467.

Reviewing the whole trial record, we decline to say the evidence tilted so far in Steven's direction that an instruction placing the burden on him to disprove undue influence over John and Joyce would have had no impact on the outcome. On balance, we see this case viewed from Steven's perspective as, at best, a close one, meaning the allocation of the burden of proof on undue influence may very well have affected the jury verdicts. The evidence offered multiple indicators of undue influence:

• Steven presented the contract to sell the homestead to John as he was dying from pancreatic cancer. A physician testified that John probably did not fully comprehend the transaction. The same day, Steven had Joyce sign the contract after she had been admitted to the hospital. The physician similarly suggested she was in no condition to make significant financial decisions. Even if John and Joyce had the capacity to enter into contracts, their weakened conditions could have made them susceptible to pressure from Steven to act when they otherwise would not have.

• Jebediah purchased the homestead at a discounted price on especially favorable terms calling for installment payments to Joyce for 20 years.

• Four months later, Steven presented Joyce with a contract to sell two parcels of farmland to Jebediah. The contract was drafted at Steven's request by the law firm that had regularly done work for John and Joyce. Joyce had not seen the contract before Steven took her to the law office to sign it.

• Jebediah purchased the farmland at a steeply discounted price again on favorable terms with installment payments to Joyce for 30 years.

13

• As a result of the land sales to Jebediah, the only significant asset left in a trust John and Joyce had set up years earlier was a quarter section of farmland that would go to Steven upon their deaths. The land Jebediah bought would have gone to John and Joyce's other children. Joyce never expressed any interest in or took any steps to change the trust.

• After John's death, Steven repeatedly told Joyce she needed to let Jebediah buy the land because her other children would eventually sell off the land they received through the trust, thereby destroying the family farm. But the trust gave Steven a first option to purchase any of the land his siblings might wish to sell and established an appraisal process to set a fair market price.

• John and Joyce's other children were not informed of the land sales to Jebediah, even though the transactions adversely affected their beneficial interests created in the trust.

Those circumstances show Steven presented the first contract to John and Joyce when they were especially vulnerable. And Joyce was afforded no opportunity to review or consider the second contract. Steven engineered the transactions without informing his siblings, who, as a result, lost the only assets they would have received from the trust. Steven pressured Joyce to sell the homestead and farmland to Jebediah for much less than fair value—real property that otherwise would have been gone to Steven's siblings through the trust. He relied on a plea to Joyce that the family farm would be lost if she didn't. But Steven actually had the right to purchase that land from his siblings under the trust, although the price almost certainly would have been considerably higher than what Jebediah paid.

The evidence arguably depicts Steven manipulating John and Joyce to secure for his own benefit (through Jebediah) real property that John and Joyce had already made a

deliberative choice to bequeath to John W., Sue, and Wilma. He did so with what could be characterized as ambush-like presentations of sales contracts to John and Joyce and wily entreaties to Joyce. Although we decline to speculate about precisely why the jury found for Steven and Jebediah, we easily conclude they cannot show to a reasonable probability the result would have been the same had they been required to prove the absence of undue influence.[1]

[1] As a legal matter, it makes no difference that Steven exerted the challenged influence over John and Joyce for the immediate benefit of Jebediah. See *Frame*, 202 Kan. at 467. Steven benefitted because his son acquired the homestead and farmland at considerably less than fair market value, removing those properties from the trust John and Joyce had set up. Steven and Jebediah had already partnered in running the farm.

The district court's instructional error, therefore, cannot be disregarded as harmless. The mistake deprived Joyce of fair consideration of her undue influence claims and requires reversal of those verdicts for Steven and Jebediah with a remand to the district court for further proceedings.

*District Court Erred Even Under Inapplicable Testamentary Law*

Before getting to the appropriate remedy on remand, we pause to explain the district court's mistaken analysis leading to the instructional error. The district court concluded that the rule recently repeated in *Cresto* governing testamentary instruments, such as wills and trusts, governed this issue, meaning Joyce had to show both a confidential relationship with Steven and "suspicious circumstances" surrounding the contracts to shift the burden of proof on undue influence. How the district court came to that conclusion isn't entirely clear given the longstanding distinction in Kansas law between contracts and testamentary instruments when it comes to proof of undue influence when confidential relationships may be involved.

15

The court in *Frame* reiterated the established rule governing contracts between parties in a confidential relationship. 202 Kan. at 467. That rule and the distinction between contracts, on the one hand, and testamentary instruments, on the other, when it comes to undue influence reach deep into Kansas legal history, as the extended discussion in *Smith* illustrates. 84 Kan. at 244-47. Although *Smith* clearly defines the differing treatment of contracts and wills, the courts have offered no readily discernible policy rationale for the dichotomy. We suppose a couple of reasons might be at work. First, the law strongly favors effectuation of a will over intestate succession. *Parsons v. Smith, Trustee*, 190 Kan. 569, 573, 376 P.2d 899 (1962); *In re Estate of Crawshaw*, 15 Kan. App. 2d 273, 279, 806 P.2d 1014 (1991). Second, a disputed will cannot be probated or enforced unless the document has been witnessed and the witnesses testify the testator voluntarily signed it and appeared to be mentally competent or the will is "self-proved" through an affidavit of the witnesses that the testator "was of sound mind and under no restraint." See K.S.A. 59-606. Those considerations in tandem arguably support a more rigorous standard to reverse the usual burden of proving undue influence for wills than for contracts.

Nothing in *Cresto*, a will contest, suggests the law on this point has changed. While *Cresto* doesn't discuss undue influence claims in contract cases—law that would have been irrelevant—it repeatedly relies on *Ginter v. Ginter*, 79 Kan. 721, 101 P. 634 (1909), another early Kansas case discussing the differences between undue influence in contract disputes and will contests and a key precedent in *Smith*, 84 Kan. at 245-46. The district court incorrectly transplanted into this case the legal test for reversing the burden of proof on undue influence in will contests, as outlined in *Cresto*.

In the district court and again on appeal, Steven relies heavily on *Heck v. Archer*, 23 Kan. App. 2d 57, 927 P.2d 495 (1996), that unfortunately (and, in our view, incorrectly) blurs the distinction between contract cases and will contests involving assertions of undue influence. In that case, Heck set up several pay-on-death bank

16

accounts with substantial deposits. Upon his death, the account balances were to go to a woman with whom he had an intermittent relationship. An heir of Heck's challenged the pay-on-death accounts as the product of the woman's undue influence over Heck. By statute, pay-on-death bank accounts were then and are now considered nontestamentary, even though they function, in part, to shift assets from someone who has died to a designated beneficiary. K.S.A. 2017 Supp. 9-1215. This court held that no confidential relationship existed between Heck and the woman, so she did not bear the burden of proving the absence of undue influence. 23 Kan. App. 2d at 64. The court, however, summarized what it characterized as the law governing contracts and wills as "nearly identical" and as requiring both a confidential relationship and suspicious circumstances to shift the burden of proving undue influence to the person seeking to enforce the contract or will. 23 Kan. App. 2d at 62-63. Without acknowledging authority such as *Frame*, *Smith*, and *Ginter*, the court incorrectly collapsed the rule governing proof of undue influence in contract disputes into the different rule for will contests. Here, the district court may have been misguided by the incomplete discussion in *Heck* and, as a result, relied on the rule for wills and other testamentary instruments laid out in *Cresto*.

Even if we are mistaken and the rule in *Cresto* actually applies, thereby requiring both a confidential relationship and suspicious circumstances to shift the burden of proof on undue influence, the district court erred in fashioning the jury instructions. The district court considered the trial evidence and concluded Joyce had presented insufficient evidence to prove suspicious circumstances and, therefore, simply instructed the jurors that Joyce had to establish undue influence. The district court effectively weighed the evidence as if it were a super juror and ruled against Joyce. But that is not the correct standard in determining whether to instruct a jury. The test is whether reasonable jurors *could* view the evidence as supporting the disputed proposition—here, under *Cresto*, were there suspicious circumstances surrounding either or both contracts? See *State v. Lindemuth*, 55 Kan. App. 2d 419, Syl. ¶ 2, 417 P.3d 262 (2018) ("A requested jury instruction should be given when there is sufficient evidence that a rational fact-finder

17

could use to find for [the party] on that theory."). If so, the district court should instruct the jurors.

The existence of suspicious circumstances typically presents a question of fact. But what constitutes suspicious circumstances is especially elastic and turns on the particulars of a given case. *Cresto*, 302 Kan. at 836; *In re Estate of Haneberg*, 270 Kan. 365, 376, 14 P.3d 1088 (2000); *In re Estate of Bennett*, 19 Kan. App. 2d 154, 170, 865 P.2d 1062 (1993). What may be suspicious in one case may not be in another case. *Cresto*, 302 Kan. at 835-36.

The trial evidence we have laid out as indicative of undue influence also, by and large, could reasonably be considered suspicious circumstances. For example, the contracts effectively disinherited John W., Sue, and Wilma in contradiction of the trust John and Joyce had set up. See *Cresto*, 302 Kan. at 836-37 (unexplained disinheritance of children likely suspicious). Joyce's apparent lack of interest in or initiative to alter the trust only heightens the suspicious character of the contracts. The particularly favorable terms of sale could be suspicious, especially given the conditions under which each contract was signed. And Steven's repeated pleas to Joyce that the sale of the farmland to Jebediah was essential to preserve the family business when the trust gave Steven a right to purchase that land, albeit at a fair market price, could be characterized suspicious.

In short, the pattern of Steven's conduct in preparing and presenting the contracts coupled with the substantial benefit accruing indirectly to him and directly to Jebediah and the concomitant disadvantage to John W., Sue, and Wilma establishes more than enough to allow a fact-finder to conclude the transactions were rife with suspicion. Had *Cresto* governed here (though we think it did not), the district court should have instructed the jury on confidential relationships and suspicious circumstances in conjunction with who bore the burden of proving undue influence. Even under its view of

18

the controlling law, the district court committed reversible error in failing to submit the question of suspicious circumstances to the jurors for their determination.[2]

[2]We do not delve into the best way to have presented those interlocking issues to the jurors. Who bore the burden of proof of undue influence—Joyce or Steven—would have depended upon the jurors' factual findings on whether there were confidential relationships and suspicious circumstances. One option would have been to give the jurors a conditional instruction that informed them that *if* they found confidential relationships and suspicious circumstances, *then* Steven had to prove the absence of undue influence *but otherwise* Joyce had to prove there was undue influence. Another option would have been to bifurcate the issues, entailing sequential instructions, arguments, and jury determinations first on confidential relationships and suspicious circumstances and then on undue influence with the burden of proof fixed by the initial determinations. See ABA Civil Trial Practice Standards § 10.e (2007) (trial court should consider submitting issues to jury sequentially if determination of one issue may moot others).

By any measure, the district court failed to adequately instruct the jurors on the law applicable to Joyce's undue influence claims. The error prejudiced Joyce and, given the trial evidence, cannot be dismissed as harmless. We reverse the verdicts in favor of Steven and Jebediah finding neither contract to be the product of undue influence. On appeal, Joyce challenged the jury instructions in other ways she contends deprived her of fair consideration of her undue influence claims. We need not and do not consider those arguments given our decision to otherwise reverse those verdicts.

JOYCE FAILED TO ESTABLISH REVERSIBLE ERROR ON CAPACITY CLAIMS

*Factual and Procedural Background*

At trial, Joyce contended that neither she nor John had the required mental capacity to enter into a binding contract when they agreed in May 2014 to sell the homestead to Jebediah. And she likewise argued she lacked capacity to contract in September when she sold the farmland to Jebediah. The jury returned verdicts in favor of

19

Steven and Jebediah on the lack of capacity claims. On appeal, Joyce challenges those verdicts on factually interrelated bases of improper closing argument by Steven and Jebediah's lawyer and juror misconduct during deliberations. We find insufficient grounds to reverse the verdicts for those reasons. Those arguments, if well-taken, also would have required reversal of the verdicts for Steven and Jebediah on undue influence.

A person lacks the capacity to enter into a contract if he or she hasn't the mental wherewithal "to understand in a reasonable manner the nature and effect" of the agreement. *DeBauge Bros., Inc. v. Whitsitt*, 212 Kan. 758, 762, 512 P.2d 487 (1973). Because the appellate challenges Joyce presses do not depend on the trial evidence related to capacity, we need not recite that evidence or comment further on the law governing the lack of capacity to contract. But we do need to add some other facts and procedural history to put the challenges in context.

In her petition, Joyce sued the law firm for professional negligence and breach of fiduciary duty for its role in preparing both contracts and its participation in the September 2014 meeting at which Joyce signed the contract selling the farmland. She sought money damages on those claims. Before trial, Joyce dismissed the law firm as a defendant. Information in the record indicates Joyce and the law firm reached some sort of settlement.

During the trial, the jurors heard no evidence about Joyce's specific complaints about the law firm's conduct, that the law firm had been sued, or that some resolution between Joyce and the law firm had been reached. But the lawyer who prepared the contract for sale of the homestead and the lawyer who prepared the contract for the sale of the farmland and participated in the September 14 meeting with Joyce both testified.

In closing argument, Joyce's lawyer told the jurors those lawyers had violated their duty to Joyce and had "failed in a key job" by acting as they did on behalf of Steven.

20

Steven and Jebediah's lawyer countered that if Joyce believed the lawyers acted inappropriately, she should "make a claim against them . . . . There's no evidence." Joyce, of course, did make a claim against the lawyers, so the counterargument was, at the very least, deceptive and improper. Her lawyer did not immediately object but requested a bench conference before beginning his rebuttal to the jury. The bench conference was off the record, so we don't know what the lawyers or the district court said. In their briefs, the parties agree the discussion focused on the remark of Steven and Jebediah's lawyer suggesting Joyce should have made a claim against the lawyers involved in preparing and presenting the contracts.

In his rebuttal, Joyce's lawyer told the jurors:

"[Steven's counsel] implied to you that if we had a problem with [the lawyers], that we should have made a claim against them. Do you remember him saying that to you? Implying that if we really felt that way, we should do something about it. We all have been very diligent this entire trial of not exposing you guys to the fact that they were sued for breach of duty to Joyce Moore, for breach their duty they owed to her, because we agreed to keep it confidential. [Steven's counsel] opened the door by implying that if we really meant it, we should bring a claim against them. Well, we did. And they got their carrier involved and they paid for breaching their duty to Joyce Moore. We thought we would do this case without that fact being known to you, but now it is because the door was opened. Factor that into your deliberations, too. I think you're entitled to that."

Joyce's lawyer offered that rebuttal argument without objection from Steven and Jebediah's lawyer or admonition from the district court. We, therefore, presume that during the off-the-record conference, the district court authorized the gist of the rebuttal as a remedy for the improper argument from Steven and Jebediah's lawyer. We, of course, don't know if Joyce's lawyer preferred some other fix or if they even considered an alternative, such as a curative instruction from the district court.

In a motion for a new trial, Joyce cited the remark of Steven and Jebediah's lawyer as sufficiently prejudicial to deprive her of a fair trial. She also asserted two instances of purported juror misconduct, one of which ties back to the closing argument kerfuffle. Joyce alleged several jurors talked about the settlement with the law firm during deliberations and suggested Joyce would be financially secure as a result of that settlement combined with what she would receive from the land sales to Jebediah. Joyce also alleged that during deliberations the presiding juror said he knew her and the Moore family. In jury selection at the start of the trial, he did not disclose that he knew any of the parties. Joyce submitted a short affidavit from one juror with her motion confirming both assertions. The motion itself recites that Joyce's lawyer spoke with two other jurors who said the settlement with the lawyers came up during deliberations.

The district court held a hearing on Joyce's motion for a new trial. A transcript of that hearing has not been included in the record on appeal. The district court denied the motion in an order entered several months later that simply identified and denied without explanation the points Joyce had raised.

*Juror Misconduct*

On appeal, Joyce reprises the juror misconduct arguments and submits the jurors' discussion of her settlement with the lawyers demonstrates actual prejudice flowing from the closing argument. We first look at the claimed misconduct and then turn to the closing argument.

As the party alleging error, Joyce must furnish a record that supports the claimed mistakes. See *State v. Kidd*, 293 Kan. 591, 601, 265 P.3d 1165 (2011); *State v. Paul*, 285 Kan. 658, 670, 175 P.3d 840 (2008). Thus, "[w]hen there are blanks in that record, appellate courts do not fill them in by making assumptions favoring the party claiming

22

error in the district court." *Harman v. State*, No. 108,478, 2013 WL 3792407, at \*1 (Kan. App. 2013) (unpublished opinion). And that poses a problem here.

As a sworn statement containing firsthand observations, the affidavit from the juror, though cursory, was procedurally sufficient to warrant a hearing on the issue. *Cornejo v. Probst*, 6 Kan. App. 2d 529, Syl. ¶ 2, 630 P.2d 1202 (1981); cf. *Douglas v. Lombardino*, 236 Kan. 471, 489-90, 693 P.2d 1138 (1985) (motion for new trial based on newly discovered evidence requires supporting affidavit, deposition, or comparable foundation). The unsupported representations in the motion reciting what other jurors later said about their deliberations probably were not. An affidavit, however, typically would not be admissible as substantive evidence at a hearing. It is the out-of-court declaration of the affiant and, thus, inadmissible hearsay. *In re Marriage of Lynn*, No. 114,154, 2016 WL 3856630, at \*3 (Kan. App. 2016) (unpublished opinion) ("Affidavits are generally treated as inadmissible hearsay at trial and in most evidentiary hearings, since the declarants cannot be cross-examined and the factfinder cannot gauge their demeanor."). Here, the affiant's own statements about what happened in the jury room fit within no hearsay exception. Nothing in the record indicates the juror signing the affidavit appeared or testified at the hearing on Joyce's motion for a new trial. See K.S.A. 2017 Supp. 60-460(a) (hearsay exception for out-of-court statements when declarant present and available for cross-examination).

Because we have no transcript, we don't know what the parties presented (or objected to) as evidence at the hearing. And we don't know why the district court denied Joyce's point. What we can and do say is that while the juror affidavit alone may have been sufficient to trigger a hearing, it failed to provide a sufficient evidentiary basis to grant the motion at a hearing. From what we have before us, we cannot find the district court erred in denying Joyce a new trial because of juror misconduct. We have no basis to conclude Joyce presented *any* admissible evidence at the hearing in support of the claim. Given the paucity of evidence, we offer no opinion on the substantive merits of either

23

allegation of misconduct. The product of that endeavor would be inappropriately speculative and advisory. See *State ex rel. Schmidt v. City of Wichita*, 303 Kan. 650, 659, 367 P.3d 282 (2016) ("Kansas courts do not issue advisory opinions.").

*Improper Jury Argument*

Turning to the improper jury argument, we begin with the general principle that district courts have broad authority in remedying lawyer error or misconduct during trial. See *State v. Sherman*, 305 Kan. 88, 118-19, 378 P.3d 1060 (2016) (district court denial of mistrial for alleged prosecutorial error reviewed for abuse of discretion); *Thompson v. KFB Ins. Co.*, 252 Kan. 1010, 1030, 850 P.2d 773 (1993). If the district court acted within that authority in addressing the comment from Steven and Jebediah's lawyer, then Joyce can show neither a sound basis for a new trial nor an error in denying her motion. We apply an abuse of discretion standard in reviewing the district court's handling of the objectionable argument. A district court exceeds that discretion if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011).

As with the juror misconduct issue, we are hamstrung by an incomplete record, most notably the off-the-record bench conference. We obviously haven't a transcript. And nobody later summarized on the record the gist of the discussion and the resulting ruling. So we don't know why the district court decided to permit a brief rebuttal argument disclosing the claim Joyce brought against the lawyers and the resulting settlement as the best remedy for the comment from Steven and Jebediah's lawyer. Particularly pertinent to our task, we have no idea whether Joyce's lawyer requested that remedy or really wanted something else. If that were the corrective Joyce sought, she can't complain about it now as a basis to upset the jury verdicts. That would be an invited error precluding appellate

24

relief. See *State v. Hargrove*, 48 Kan. App. 2d 522, 531, 293 P.3d 787 (2013). From the appellate record, we can't say. In a civil case, we might infer Joyce's claimed error to have been invited based on a silent record.

But maybe Joyce's lawyer asked for a mistrial or an instruction from the district court to the jurors and had to settle for a limited disclosure about the litigation with the lawyers. If the record showed as much, we could assess the relative merits of the requested relief as against the relief the district court allowed. We don't have the necessary information to do so, and Joyce had the obligation to furnish that information to us.

Given those constraints, we cannot say the district court abused its discretion on this point. We presume the district court understood the factual circumstances. It had handled the case for months and was familiar with Joyce's claims against the lawyers. It heard the trial evidence and the closing arguments. Nothing in the record suggests the district court misapprehended what happened. We don't see a patent legal error in the relief afforded Joyce, although we suppose there might have been more efficacious ways to repair the damage done. That's not the test. We have the luxury of hindsight and virtually unlimited time to contemplate an unusual situation the district court had to resolve with dispatch. Because the appellate record establishes neither a factual misunderstanding nor a clear legal mistake, we are left to ask whether another district court would have handled the problem essentially the way this district court did. Our answer is yes. The district court's solution came within the broad range of reasonableness that characterizes judicial discretion.

As we have described, Joyce challenged two contracts selling land to Jebediah on the grounds of lack of capacity and of undue influence. Those are independent bases for vitiating the contracts. So the trial centered on four claims.

We have found instructional errors sufficiently misinformed the jurors about the law governing the undue influence claims to deprive Joyce of a fair hearing on those claims. Those verdicts in favor of Steven and Jebediah on both contracts must be set aside, along with that part of the judgment.

We have found no reversible error with respect to the verdicts for Steven and Jebediah on the lack of capacity claims as to both contracts. Those verdicts remain in place.

The verdicts that John and Joyce had the capacity to enter into contracts do not, however, have any direct legal effect on the undue influence claims or the instructional defects rendering those verdicts legally insufficient. That's because individuals with the mental capacity to enter into contracts may still be unduly influenced to agree to things they otherwise would not, thereby rendering any contract void. See *Rezac v. Rezac*, 115 Kan. 482, 484, 223 P. 295 (1924) (district court decision finding deeds valid affirmed where evidence supports finding grantor had capacity to contract *and* was not subject to undue influence); *Linn v. Blanton*, 111 Kan. 743, 749, 208 P. 616 (1922) ("[T]hat Blanton had mental capacity to make the deed . . ., we do not think [that] establishes undue influence."). Were the law otherwise, lack of capacity would be a necessary condition for a successful undue influence claim. In turn, undue influence claims would become vestigial, since lack of capacity would void any contract without the need to consider undue influence.

The judgment for Steven and Jebediah must be reversed. The case has to be remanded to the district court for further proceedings on Joyce's undue influence claims as to both contracts.

PROCEEDINGS ON REMAND

Ordinarily when a party has been deprived of a fair trial because jurors have been incorrectly instructed on the law, the party would be entitled to a do-over with a new jury. As we explain, Joyce had no right to a jury trial in the first place, so she can't be entitled to another one as a remedy here. But she is and always has been entitled to a fair hearing in front of an appropriate fact-finder. Because Joyce has asserted equitable claims, the district court properly acts as the fact-finder in a bench trial. So what Joyce should receive on remand is a fair bench trial, and that does not require a new trial.

Both claims Joyce pursued at trial—lack of capacity and undue influence—were equitable rather than legal in that they effectively would void or rescind the contracts rather than yield money damages for breach. See *In re Estate of Johnson*, 176 Kan. 339, 345, 270 P.2d 293 (1954) (undue influence in transfer of real property presents equitable claim); *Peterson v. Peterson*, 10 Kan. App. 2d 437, Syl. ¶ 2, 700 P.2d 585 (1985) (characterizing undue influence as claim "cognizable in equity"). Rescission is recognized as an equitable remedy. *Waggener v. Seever Systems, Inc.*, 233 Kan. 517, Syl. ¶ 4, 664 P.2d 813 (1983); *Harnden v. Hadfield*, 113 Kan. 525, 527, 215 P. 441 (1923). A successful claim for rescission does not call for money damages as a remedy. Money damages for what historically would have been a claim at law typically triggers the right to a jury trial. *Waggener*, 233 Kan. at 523; *In re Estate of Heiman*, 44 Kan. App. 2d 764, 771-72, 241 P.3d 161 (2010).

Since undue influence entails an equitable claim for which Joyce sought rescission, she had no right to a jury trial. See *Waggener*, 233 Kan. 517, Syl. ¶ 4 ("Rescission is a suit in equity[,] and the party is not entitled to a jury trial as a matter of

right."); *In re Estate of Johnson*, 176 Kan. at 345. Steven and Jebediah pursued no counterclaims, so they had no independent basis to request a jury trial.[3]

[3]By contrast, Joyce's claims against the lawyers for professional malpractice and breach of fiduciary duty, for which she sought money damages, were legal rather than equitable and would have supported a request for a jury trial. But Joyce dismissed those claims before trial and could no longer demand a jury trial as a matter of right. Steven and Jebediah did not object to a jury trial at that point, although they could have. And the district court could have required the parties to proceed with a bench trial. The district court also had the option to empanel an advisory jury, but it didn't do that either. See K.S.A. 2017 Supp. 60-239(c) (district court may seat advisory jury or otherwise try any issue to a jury with consent of the parties).

Before trial, Joyce suggested that if she prevailed on either of her claims for lack of capacity or undue influence, she would be entitled to at least a portion of the profits Steven and Jebediah realized from the farming operation from 2014 forward. The record isn't clear about the status of her position; there is some indication she withdrew her request for that relief. Even if she didn't, the request entailed an accounting and disgorgement, although Joyce did not use that terminology. Those are equitable remedies and would not have supported a right to jury trial. See *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. ___, 134 S. Ct. 1962, 1978, 188 L. Ed. 2d 979 (2014) (disgorgement of "unjust gains" form of equitable relief); *Karnes Enterprises, Inc. v. Quan*, 221 Kan. 596, 603, 561 P.2d 825 (1977) (accounting constitutes equitable relief); *Carnes v. Meadowbrook Executive Bldg. Corp.*, 17 Kan. App. 2d 292, 297, 836 P.2d 1212 (1992) (same). They are also closely allied remedies in that an accounting may be necessary to determine the amount to be disgorged as improper financial gain or profit. See *SCA Hygiene Products Aktiebolag v. First Quality Baby Products, LLC*, 580 U.S. ___, 137 S. Ct. 954, 964, 197 L. Ed. 2d 292 (2017); Roberts, *Supreme Disgorgement*, 68 Fla. L. Rev. 1413, 1427 (2016) (noting "historical affiliation" of disgorgement "with the equitable remedy of accounting").

Here, the error on which we reverse tainted the jury deliberations, resulting in deficient verdicts on the undue influence claims. But the error did not infect other parts of the trial. The district court saw the witnesses and examined the documentary evidence along with the jurors. The district court is, therefore, in a position to make findings of fact and conclusions of law based on the testimony and other evidence admitted during the jury trial. The witnesses need not again assemble to testify to what they have already said under oath before the district court.

In her appeal, Joyce has not asserted any material issues with the evidentiary record. That is, she has not complained that the district court erred in admitting or excluding evidence during the trial. Even if there were evidentiary problems, they would not require a complete do-over. The district court could simply disregard improperly admitted evidence and would have the authority to supplement the existing record by receiving any improperly excluded evidence. But neither appears to be necessary here.

On remand, the district court certainly can ask the parties for proposed findings and conclusions or invite additional argument from their lawyers on the undue influence claims as to both contracts if that would be helpful. In short, the district court should now treat the 2015 jury trial as a bench trial and make findings of fact and conclusions of law resolving Joyce's undue influence claims based on the trial evidence.

Finally, we do not now and have not intended to suggest how the district court should decide those claims or the scope of any appropriate equitable remedy to be afforded Joyce if she prevails in any respect.

Affirmed in part, reversed in part, and remanded with directions.