NOT DESIGNATED FOR PUBLICATION

No. 127,083

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

TRACI K. PFANNENSTIEL, et al.,
*Appellees*,

v.

RYAN P. PFANNENSTIEL,
*Appellant*.

MEMORANDUM OPINION

Appeal from Ellis District Court; THOMAS DREES, judge. Submitted without oral argument. Opinion filed March 6, 2026. Affirmed.

*Todd D. Powell*, of Glassman Bird Powell, LLP, of Hays, for appellant.

*Derek S. Casey*, *Rachel K. Pirner*, and *Theron E. Fry*, of Triplett Woolf Garretson, LLC, of Wichita, and *Carol M. Park*, of Schwartz & Park, LLP, of Hays, for appellees.

Before ISHERWOOD, P.J., WARNER and HURST, JJ.

ISHERWOOD, J.: This is a trust case concerning the proper scope of the authority conferred upon an attorney-in-fact (AIF) who is appointed through a validly executed durable power of attorney (DPOA). The powers vested in an AIF are typically general in nature but may be expanded to include certain particularized responsibilities so long as the grantor complies with the statutory requirement to expressly include that intention within the written terms of the DPOA. Thus, the precise language used to draft the DPOA dictates the parameters of the authority enjoyed by an AIF.

1

In this particular matter, the grantor executed a restated trust agreement which specifically stated that the power to amend, modify, or revoke its terms rested in him alone. He also created a DPOA that granted the AIF broad general powers, including the latitude to establish a revocable trust, solely for the grantor's benefit, with a corpus from "any or all" of the grantor's estate.

Several years later, the grantor fell gravely ill and was placed on life support. The AIF took that opportunity to surreptitiously execute a Statement of Trust (SOT) that stripped the grantor's wife, her children from a prior marriage, and grantor's biological son of the beneficiary status they enjoyed under grantor's restated trust agreement. The grantor's wife initiated this litigation, and the district court ultimately granted her request for summary judgment. It determined that the AIF lacked the specific authority required to carry out the acts contemplated by the SOT and nullified that instrument. The district court further found that the AIF's conduct amounted to a breach of the fiduciary obligation he owed to the grantor and determined that the best course of action was to eliminate his ability to serve as a successor trustee for the grantor's restated trust agreement.

The AIF pursued this appeal and, following a careful review of the complexities of this case, we are satisfied that the district court rendered the correct decision when it voided the SOT on the basis that the AIF's authority did not permit him to revoke portions of the grantor's restated trust agreement. Those modifications impermissibly abolished the beneficiary interests that the grantor's wife and stepchildren, as well as his biological son, had in his estate. We also agree that the AIF's actions undermined the estate plan meticulously crafted by the grantor and amounted to a breach of his fiduciary responsibilities. Accordingly, the decision of the district court is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

The majority of the foundational facts are not in dispute. In 2007, Curtis Pfannenstiel established a revocable living trust for the benefit of himself and his three children from a previous marriage—his son, Quin, and his two daughters, Arin and Emma Pfannenstiel. The corpus of the trust was substantial and included all the property that Curtis owned, as well as any he acquired in the future, and the trust estate was designated to pass, in equal distributions, to his surviving children and their issue upon his death.

The terms of the trust identified Curtis as its settlor/grantor, as well as its trustee. Ken Beran and Curtis' brother, Ryan, were designated as the successor trustees. It was clear from the language of the trust provisions that Curtis intended to exercise sole and firm control over its operation. He specifically reserved, exclusively for himself, the right to "amend, alter, revoke or terminate" the trust or any provisions thereof at any time.

In 2011, Curtis married Traci Splichal and executed a restated trust agreement the following year to include her as a beneficiary, alongside all three of his biological children, Quin, Arin, and Emma. Once again, the terms made clear that Curtis held the "*absolute* right and power" to alter, amend, or revoke the trust and trust agreement either in whole or in part. (Emphasis added.) In the event that Curtis became incapacitated, his condition's impact upon the trust agreement remained the same as under the terms of the original trust. That is, it merely permitted the trustee to utilize the net income and principal of the agreement to cover those expenses required to maintain Curtis' health and well-being. There was no indication that with his incapacitation came the trustee's authority to step into Curtis' shoes and alter the terms of the trust agreement.

While many of the original trust terms were left undisturbed by Curtis' marital union with Traci, he did amend those provisions that controlled distribution of the trust

3

proceeds upon his death. First, the full interest in his personal effects and any insurance proceeds associated therewith was specifically designated to Traci. Any real or personal property that remained following fulfillment of the distributions he provided for upon his death would become the residuary trust estate which would then later be divided between two different trusts, a marital trust and a family trust. Curtis also specifically inserted a provision that enabled Traci to receive, upon his death, a one-time, outright distribution from his gross trust estate, unencumbered by any of the aforementioned trusts. The number of years they were married at the time of Curtis' passing was a factor that informed the percentage of her distribution.

Curtis outlined his strict expectations for the marital and family trusts. He designated Traci as the sole beneficiary of the net income generated by the marital trust, for the remainder of her life, and directed the trustee to provide those distributions to her on a semi-annual basis. Curtis specifically prohibited anyone from appointing either the income or the principal of that trust to someone other than Traci, thereby insulating the asset for Traci's benefit.

The family trust was designated as the resource the trustee would pull from for any additional financial resources required to sustain Traci's support, maintenance, health, and education following Curtis' death, provided she did not already receive $36,000 from the marital trust within the same year. In the event she had already received that sum, her distribution from the family trust would be redirected to Curtis' three biological children, so long as each child received no more than $30,000 annually. Curtis also vested the trustee with the discretion to make distributions to Traci or to Curtis' three children from the principal of the family trust to the extent necessary to adequately provide for their health, maintenance, support, and education. In the event of Traci's passing, the remainder of the entire trust proceeds was to be divided equally among Curtis' three children and held in trust in accordance with his specific directives.

The obligations imposed upon the trustee were considerable given the magnitude of Curtis' net worth, so Curtis painstakingly outlined the measures required to carry out his vision for the estate. The trustee's powers were not unfettered, however, and could not be exercised beyond the precise terms designated by Curtis.

On the same day that Curtis executed the restated trust agreement he also finalized his "Last Will and Testament" to incorporate the trust agreement by reference, and he also completed a general DPOA that designated his brother, Ryan, as his AIF. The terms granted Ryan the authority to manage Curtis' property and assets, consistent with the general power that is frequently conveyed through such instruments. Ryan was also vested with the following limited authority:

> "To establish a revocable trust or revocable trusts, solely for the benefit of me and my estate, and to assign and convey any or all of my estate (consisting of any property, real, personal or mixed, of whatsoever kind and wheresoever located and whensoever acquired) into such trust or trusts and on such terms as my Agent shall deem proper and in my best interests; provided that any such trust shall be revocable and shall include a provision that it is revocable by an instrument in writing signed by me personally and not in any event by any personal representative (e.g., a guardian of my person and/or of my estate) acting on my behalf; provided further that any such trust shall also provide that if I am unable to personally revoke it, then it shall be revocable by my Agent solely in my favor and in favor of my estate."

Notably, Curtis chose this time to insert new language into the restated trust agreement to clarify that "[n]o guardian or other similar representative of the Grantor" possessed either the right or the power to modify the trust instrument in any way, and upon his passing the trust agreement "and all trusts created hereunder" shall become irrevocable. Or stated another way, once he passed, so too did any opportunity to modify the instrument's terms.

Several months later, Curtis opted to exercise the "absolute right and power" he reserved for himself to alter or amend the restated trust agreement. The resulting amendment supplemented the one-time monetary distribution Traci was designated to receive upon his death with a specific tract of real property. As with its financial counterpart, Curtis clarified that the land transfer was an outright distribution and was not to be encumbered by any of the trusts created under the restated trust agreement.

Roughly five and a half years passed before Curtis revisited the restated trust agreement again. When he did so, he reiterated that the "absolute power" to alter, amend, or revoke the terms of the restated trust agreement rested in him alone. He also amended the "family declaration" provision by removing his son, Quin, from the list of individuals who fell within that category and thereby limited his "issue" to his two biological daughters, Arin and Emma. Corresponding adjustments were made to the distribution provisions. Specifically, where Quin originally stood to inherit a third of the contents of the estate, as divided equally with his two sisters whenever Traci passed away, his inheritance was reduced to a single, outright distribution of $100,000. Curtis also expanded the list of his beneficiaries to include Traci's three children from a prior marriage—Braden, Sidney, and Konnor—and directed that each receive a single distribution of $25,000 upon Curtis' passing.

The distributions that Curtis intended for Traci to receive from the family trust were also modified at that time. The restated trust agreement identified the family trust as a resource available for any supplemental financial assistance that was necessary to ensure Traci's needs were adequately met following Curtis' death. However, the trustee could only dip into the family trust for that purpose if Traci had not already received the maximum distribution from the marital trust within the same year. Curtis amended the amount of that maximum distribution to increase it from $35,000 to $50,000. In the event Traci had already received that sum, the distribution she was otherwise eligible to receive from the family trust would be redirected to Curtis' two daughters only, so long as neither

child received more than $30,000 annually. Quin's name was previously included with that of his sisters as a designated recipient for this bypass distribution but was removed by Curtis during this phase of amendments. The remaining terms of the restated trust agreement were not altered.

In September 2020, Curtis filed for divorce. Two months later, however, he instructed his lawyer not to undertake any further action in the case because he and Traci were attempting to reconcile. The case ultimately never progressed beyond the initial pleadings and the filing of an ex parte temporary order, but it was also not ever formally dismissed. Notably, Curtis never took any affirmative steps to modify his trust or estate plan in anticipation of the dissolution of his marriage.

In December 2020, Curtis fell gravely ill, lost consciousness, and remained unconscious until his death on January 4, 2021. Two days before Curtis' death, Ryan, acting in reliance on authority that he believed he possessed by virtue of the DPOA, executed an SOT which triggered considerable upheaval in the estate plan Curtis meticulously perfected. Specifically, it sought to (1) revoke the 2012 restated trust agreement as well as its two amendments that Curtis properly executed; (2) reinstate the initial version of the revocable trust that Curtis executed in 2007; (3) amend the trust agreement to appoint himself and his father as trustees; and (4) remove Traci, her children, and Curtis' son as beneficiaries and designate Curtis' biological daughters as the sole beneficiaries of the estate.

Traci and her children petitioned the district court to nullify Ryan's SOT, remove him as an alternate successor trustee of the restated trust agreement, and recover damages. They subsequently amended their petition to include a claim that per the *in terrorem* provision in the restated trust agreement, Arin and Emma sacrificed their ability to inherit from the estate when they opted to get involved in this litigation.

7

Ryan filed an affidavit with the district court and asserted that he was aware of the divorce proceedings during the time that Curtis was hospitalized. He also claimed that according to his father, Verlin, Traci moved back into the marital home and engaged in nefarious conduct shortly after Curtis lost consciousness. Specifically, she allegedly removed items from the residence, replaced the account for the Ring doorbell cameras, accessed Curtis' work email, attempted to obtain a new credit card in Curtis' name, and tried to change the personal information on the joint credit card she shared with Curtis to include her address only. Ryan further asserted that he observed Traci's son, Konnor, removing unknown documents from Curtis' house.

The parties cross-petitioned for summary judgment, and the district court largely decided the claims in Traci's favor. It concluded that nullification of the SOT was warranted because given that the DPOA failed to expressly authorize Ryan to change the beneficiaries in Curtis' trust agreement, the Kansas Power of Attorney Act, K.S.A. 58-650 et seq., prohibited Ryan from doing so. The district court noted that, as established by the evidence, Curtis expressly and repeatedly made clear in each iteration of his trust agreement that he was the only one who possessed the authority to amend, alter, or revoke the trust, either in part or in its entirety. Thus, any authority Ryan possessed under the DPOA with respect to trusts was limited to executing new trust agreements. Accordingly, there was no sound legal footing to sustain Ryan's SOT.

The district court further found that Ryan's conduct exceeded what could be classified as merely "unauthorized." It determined that Ryan pursued a course of action that undermined express provisions contained within Curtis' estate plans. In so doing, Ryan neglected to fulfill his obligation to exercise a superior degree of care toward Curtis' directives and scrupulously honor the same. It concluded that in light of Ryan's breach of that fiduciary duty it was in the best interests of all involved and consistent with the terms of the restated trust agreement, as well as its purpose, to relieve Ryan of his role as the alternate successor trustee for Curtis' restated trust agreement.

8

Traci failed to persuade the district court that Arin and Emma's pursuit of litigation amounted to a violation of the *in terrorem* provision in Curtis' trust. The district court reasoned that the section is designed to put beneficiaries of the trust on notice that they are prohibited from challenging any of the trust's terms, either directly or indirectly, lest they lose the beneficiary interest Curtis conveyed to them under the trust. Where the claims at issue were raised to challenge the validity of Ryan's trust, as opposed to Curtis' where the *in terrorem* provision was housed and was the trust in which the Pfannenstiel sisters were designated as beneficiaries, their involvement did not run contrary to the trust terms.

Finally, the court declined to articulate any findings in response to Traci's request for damages and attorney fees. It was of the opinion that they were not yet ripe for consideration and further evidence was required before a decision could be made on those claims.

Upon a joint request of the parties, the district court entered final judgment on the issues decided by the order granting summary judgment. Ryan now brings the case before this court requesting that we analyze whether the district court erred when it nullified his SOT and removed him as an alternate successor trustee from Curtis' restated trust agreement.

LEGAL ANALYSIS

*Did the district court err in determining that the durable power of attorney did not grant Ryan the authority to unilaterally execute a statement of trust?*

Ryan contends that the district court reached its conclusion in error when it found he lacked any authority to execute the SOT and granted Traci's request for summary judgment. He relies on two basic claims as support for his assertion of error. First, the district court erred in failing to give effect to the plainly stated directive in the DPOA

9

through which Curtis entrusted him with broad authority to "'assign and convey any or all of [Curtis'] estate into [a] trust'" on such terms that Ryan deemed appropriate and in Curtis' best interests. It is Ryan's position this authority enabled him to shield Curtis' estate from what he perceived to be Traci's questionable motives and also simply bring the restated trust agreement into alignment with the terms of the original instrument that Curtis executed in 2007. Second, given that his actions were a valid exercise of the clear authority that Curtis vested in him, the district court erred in finding that Ryan breached his fiduciary duty when he executed the SOT and that recission of his designation as an alternate successor trustee for Curtis' restated trust agreement was warranted as a result.

Traci counters that summary judgment was appropriate because the authority Curtis granted Ryan through the DPOA was not broad enough to allow him to revoke Curtis' restated trust agreement, or any portion thereof, nor is there any independent legal theory that otherwise validates his execution of the SOT. She further asserts that the nullification of the SOT potentially renders moot Ryan's challenge to the district court's removal of his designation as an alternate successor trustee and, to the extent that claim remains viable, the district court's justification for Ryan's removal was sound and provided a solid foundation for the reasonable exercise of its discretion.

*Standard of Review*

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, admissions on file, and supporting affidavits show that no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. The district court must resolve all facts and reasonable inferences drawn from the evidence in favor of the party against whom the ruling is sought. When opposing summary judgment, a party must produce evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issue in the case. Appellate courts apply the same rules and, where they find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment is inappropriate. Appellate review of the legal effect of

10

undisputed facts is de novo. [Citation omitted.]" *GFTLenexa, LLC v. City of Lenexa*, 310 Kan. 976, 981-82, 453 P.3d 304 (2019).

Ryan asserts that each dispositional action contemplated under the SOT was permissible because, consistent with the specifications of the DPOA, he simply conveyed Curtis' estate into a trust under terms that he determined were in Curtis' best interests. He contends that giving effect to the SOT only requires the revocation of certain provisions within Curtis' restated trust agreement, rather than nullification of the entire instrument. Thus, his argument goes, the SOT does not run afoul of the requirements set out under K.S.A. 58-654(f)(1) or (f)(6), which dictate that an AIF is specifically prohibited from amending or revoking any trust agreement, or changing the designation of beneficiaries, unless the DPOA expressly grants them the authority to undertake those courses of action.

Before conducting an analysis of Ryan's first claim, it is helpful to identify and explain some of the key terms and fundamental principles that are integral to the issue we are tasked with resolving. Our inquiry is guided in part by the Kansas Uniform Trust Code, K.S.A. 58a-101 et seq. (KUTC), which became effective January 1, 2003, and which largely mirrors the Uniform Trust Code (2000) (UTC). See L. 2002, ch. 133, § 1. Both bodies of law have the goal of ensuring that the settlor's intent is honored. *Godley v. Valley View State Bank*, 277 Kan. 736, 741, 89 P.3d 595 (2004); see also *In re Bradley Trust*, 60 Kan. App. 2d 66, 75, 490 P.3d 51 (2021) ("The primary intent of both the KUTC and the UTC 'is to carry out the settlor's intent.'").

The Kansas Power of Attorney Act (the Act), codified at K.S.A. 58-650 through K.S.A. 58-665, is also key to our analysis. The foundation for this legal framework for DPOAs in Kansas was initially established through the state's adoption of the Uniform Power of Attorney Act (UPAA). *Bank IV Olathe v. Capitol Fed'l Savings & Loan Ass'n*, 250 Kan. 541, 543, 828 P.2d 355 (1992). The Legislature later repealed that version to

craft the current structure that governs both durable and nondurable powers of attorney, establishes definitions, identifies the requirements for effectiveness, outlines the general powers that may be granted, and addresses the duties of the AIF.

Next, because the relationship created as a product of a DPOA is the quintessential principal and agent union in that the agent acts according to the principal's authority and instructions, key points from the law governing agency relationships also inform our evaluation of the issue. *Bank IV Olathe*, 250 Kan. at 549; *Merchant v. Foreman*, 182 Kan. 550, 556, 322 P.2d 740 (1958) (explaining the duties of an agent to a principal, which require an agent "to act with the utmost good faith and loyalty for the furtherance and advancement of the interests of his principal"); *Peterson v. Peterson*, 10 Kan. App. 2d 437, 442, 700 P.2d 585 (1985). An AIF acting under a DPOA has "a fiduciary obligation to exercise the powers conferred in the best interests of the principal, and to avoid self-dealing and conflicts of interest, as in the case of a trustee with respect to the trustee's beneficiary or beneficiaries." K.S.A. 58-656(a).

Turning to our glossary of terms, a "power of attorney" is established via a written legal instrument and is either durable or nondurable. K.S.A. 58-651(i). It contemplates one person, designated as the "principal," who appoints another as their "agent" and confers upon such agent the authority to manage personal, financial, or health care decisions on the principal's behalf. See *Muller v. Bank of America*, 28 Kan. App. 2d 136, 139, 12 P.3d 899 (2000). The agent appointed by the principal is also referred to as an "attorney in fact" (AIF). K.S.A. 58-651(a).

When the relationship falls into the "nondurable" column and the principal becomes incompetent or passes away, the AIF's authority ceases. A "durable" power of attorney, however, denotes those situations where the authority of the AIF is sustained during the principal's disability or incapacity so long as an intention for that enduring relationship is specifically stated in the written instrument. See *Geren v. Geren*, 29 Kan.

App. 2d 565, 569, 29 P.3d 448 (2001); see also K.S.A. 58-651(d); K.S.A. 58-652(a). Prior to the development of this estate planning tool, the sole mechanism through which to address challenges that arose as a result of a principal's lack of capacity was a guardianship or conservatorship proceeding. While a court-controlled guardianship remains an appropriate device in specific instances, the majority of cases involving incapacitated people are better served by the DPOA as it allows them to act preemptively and plan with greater clarity, while also avoiding the expense and delay that are common to the more formal legal proceedings. 1 Durable Powers of Attorney and Health Care Directives § 1:2 (4th ed.). Pursuant to K.S.A. 58-652(b), each act carried out by an AIF pursuant to a DPOA "*shall* inure to the benefit of and bind the principal and the principal's successors in interest." (Emphasis added.) "The interest of the agent is subject to a reserved power of revocation which is implicit in the power of attorney." *Peterson*, 10 Kan. App. 2d at 442 (citing *Bowen, Administrator v. Hathaway*, 202 Kan. 107, 114, 446 P.2d 723 [1968]).

The Act provides the primary definition for an "attorney in fact." That label is borne by "an individual, corporation or other legal entity appointed to act as agent of a principal in a written power of attorney." K.S.A. 58-651(a). Specifically, the principal delegates powers for the AIF to perform in a fiduciary capacity on the principal's behalf. Thus, the actions undertaken by an AIF are a product of the principal's directives.

The authority of the AIF is considerably broad and "shall extend to and include each and every action or power which an adult who is not disabled may carry out through an agent specifically authorized in the premises, with respect to any and all matters whatsoever." K.S.A. 58-654(b). While that provision seemingly conveys an extensive reach for the AIF, their scope is not truly all encompassing. Rather, K.S.A. 58-654(f) prohibits an AIF from performing an enumerated list of specific tasks unless the written terms of the DPOA expressly state that they have the authority to engage in that conduct.

Going one step further, K.S.A. 58-654(g) identifies those actions that are expressly prohibited from inclusion in a DPOA.

Finally, "agency" is defined as the fiduciary relationship that arises when a principal agrees to have an agent act on the principal's behalf, subject to the principal's control, and the agent consents to acting in that capacity. Restatement (Third) of Agency § 1.01 (2006). Thus, a principal-agent relationship is made up of three components: assent by both parties, a benefit to the principal, and control by the principal. *Rezac Livestock Commission Company, Inc. v. Pinnacle Bank*, 255 F. Supp. 3d 1150, 1160 (D. Kan. 2017).

With this backdrop in place, we turn to Ryan's contention that the authority Curtis conveyed to him through the DPOA authorized him to take the specific steps contained within the SOT. Therefore, the district court erred in granting summary judgment in Traci's favor. We disagree.

Again, this issue arises out of the language and terms embodied in the DPOA. The interpretation and legal effect of written instruments present matters of law; therefore, our standard of review on that point is unlimited. *First Security Bank v. Buehne*, 314 Kan. 507, 510, 501 P.3d 362 (2021); *Boucek v. Boucek*, 297 Kan. 865, 874, 305 P.3d 597 (2013). This standard allows us to exercise our own independent judgment as opposed to requiring us to afford the district court's decision a measure of deference. *State v. Graham*, 275 Kan. 176, 182, 61 P.3d 662 (2003).

It is a basic rule of contract law that courts will allow parties to choose the terms by which they will be bound under written agreements. *Squires v. Woodbury*, 5 Kan. App. 2d 596, 598, 621 P.2d 443 (1980). The primary focus when interpreting the body of a DPOA, which is a species of contract, is to ascertain the principal's intent by "'construing and considering the entire instrument from its four corners.'" *Waste*

*Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 963, 298 P.3d 250 (2013). In so doing, we use each clause to interpret the others, thereby ensuring that we carry out, rather than defeat, the purpose of the AIF's appointment. *Bank IV Olathe*, 250 Kan. at 549-50 (citing 3 Am. Jur. 2d Agency §§ 30, 31, 33); *Grocer Co. v. Kinkaid*, 86 Kan. 167, 170, 119 P. 537 (1911). Under these rules of construction, powers of attorney, unlike deeds and wills, are to be strictly construed, and the authority that is delegated to the AIF is limited to the precise terms in which it is expressed. *McGregor v. McGregor*, No. 123,657, 2021 WL 6140398, at *8 (Kan. App. 2021) (unpublished opinion). Stated another way, the scope of an AIF's power is directly tied to what is specifically granted under the terms of the written DPOA document. However, that authority is not to be construed in such a way that it defeats the intention of the principal. See *Muller*, 28 Kan. App. 2d at 139. In *Bank IV Olathe*, the Kansas Supreme Court highlighted the general rule that there is no need for construction of the language that confers a power of attorney when its terms are "'not ambiguous or uncertain, and whose meaning and portent are perfectly plain.'" 250 Kan. at 549 (quoting 3 Am. Jur. 2d, Agency § 30, pp. 533-35). To resolve the issue, we must extrapolate Curtis' objective in executing the DPOA from the language he used to do so. See *Johnson County Bank v. Ross*, 28 Kan. App. 2d 8, 10, 13 P.3d 351 (2000).

To the extent our analysis is hampered by ambiguities or uncertainty in the instrument's language, we are permitted to discern Curtis' intentions through a more global view of his estate plan, including the circumstances surrounding its preparation, and the terms ultimately decided on for inclusion in his restated trust agreement. That is, we can conduct an inquiry that also contemplates the conditions in existence when the DPOA was drafted, the objective of that written instrument, and any other circumstances tending to clarify what Curtis intended to be accomplished when he formally delegated authority to Ryan. *In re Marriage of Gerleman*, 56 Kan. App. 2d 578, 589, 435 P.2d 552 (2018). For ambiguity to exist, "a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation

15

of its language." *Simon v. National Farmers Organization, Inc.*, 250 Kan. 676, 680, 829 P.2d 884 (1992).

We now turn to the contents of the DPOA and the provisions therein that Ryan primarily relies on to establish his claim of error. The opening paragraph contains Curtis' formal appointment of Ryan as the AIF and states that Ryan's authority should encompass the following:

"full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done in and about the premises, as fully, to all intents and purposes, as I might or could do if personally present including, but not limited to, the following powers and authority:

"(1) To exercise, do, or perform any act, right, power, duty, or obligation whatsoever that I now have or may acquire the legal right, power, or capacity to exercise, do, or perform in connection with, arising out of, or relating to any person, item, thing, transaction, business property, real or personal, tangible or intangible, or matter whatsoever."

Further into the document, paragraph number (22) addresses trusts specifically and grants Ryan the authority:

"To establish a revocable trust or revocable trusts, solely for the benefit of me and my estate, and to assign and convey any or all of my estate . . . into such trust or trusts and on such terms as my Agent shall deem proper and in my best interests; provided that any such trust shall be revocable and shall include a provision that it is revocable by an instrument in writing signed by me personally and not in any event by any personal representative . . . provided further that any such trust shall also provide that if I am unable to personally revoke it, then it shall be revocable by my Agent solely in my favor and in favor of my estate."

Paragraph number (22) is the anchor for Ryan's contention that the DPOA unequivocally authorized him to execute an SOT comprised of the very terms the district

16

court concluded were impermissible. To wholly accept his proposition would require us to reject the analytical framework that requires us to "analyze particular language in consideration of the entire instrument and not with a critical analysis of a single or isolated provision." *Gilman v. Blocks*, 44 Kan. App. 2d 163, 170, 235 P.3d 503 (2010). Kansas law expressly prohibits reliance on isolated provisions when striving to identify the underlying intent for a power of attorney. Rather, courts must review "the entirety of the Durable Power of Attorney" and take "the whole of the writing" together "so as to give effect to every part." *Bank IV Olathe*, 250 Kan. at 548-49 (quoting 3 Am. Jur. 2d, Agency § 30, pp. 533-35); see also *Harder v. Foster*, 54 Kan. App. 2d 444, 453, 401 P.3d 1032 (2017) ("'An interpretation of a contractual provision should not be reached merely by isolating one particular sentence or provision, but by construing and considering the entire instrument from its four corners.'")

As noted previously, the Act addresses two potential categories of powers that the principal may confer on their AIF: those that fall under the general grant of authority and those that must be expressly granted before an AIF can undertake any of those acts. K.S.A. 58-654(a). Pursuant to the Act:

"If the power of attorney states that general powers are granted to the attorney in fact and further states in substance that it grants power to the attorney in fact to act with respect to all lawful subjects and purposes or that it grants general powers for general purposes or does not by its terms limit the power to the specific subject or purposes set out in the instrument, then the authority of the attorney in fact acting under the power of attorney shall extend to and include each and every action or power which an adult who is not disabled may carry out through an agent specifically authorized in the premises, with respect to any and all matters whatsoever, except as provided in subsection (f) and (g)." K.S.A. 58-654(b).

The Legislature then clarified, through K.S.A. 58-654(d), what is meant by the term "general powers." Pursuant to that subsection, this base level of authority vests an

17

AIF with "all rights, power and authority" to act for the principal with respect to property and financial transactions, indemnification issues arising out of the AIF's actions, and tax matters. They also are afforded the discretion to employ and compensate those agents, brokers, attorneys, and accountants that are necessary to ensure that the obligations of the principal for which the AIF is responsible are satisfied. K.S.A. 58-654(d).

The duties set forth under K.S.A. 58-654(d) largely remain consistent with those outlined in the UPAA that, again, was the initial authority in Kansas for these matters. Specifically, the general authority conveyed under the UPAA includes those transactions involving both real and tangible personal property, as well as matters concerning the principal's finances, investments, insurance, and business interests. Finally, the AIF has authority over beneficiary transactions in which the principal is, may become, or claims to have an interest, along with the principal's legal matters, personal and family maintenance, government benefits, and tax related issues. See Uniform Power of Attorney Act §§ 204-16.

The second variation of powers that a principal can convey to the AIF are those referred to as "express powers." Under the Act, as well as under the UPAA, these are certain significant acts that an AIF may only perform if they are "expressly enumerated and authorized in the power of attorney." K.S.A. 58-654(f); Uniform Power of Attorney Act § 201(a). A total of 14 acts are designated under the statute as subject to this requirement, but only the first 6 of those are relevant to our analysis and consist of the following:

"(1) To execute, amend or revoke any trust agreement;
"(2) to fund with the principal's assets any trust not created by the principal;
"(3) to make or revoke a gift of the principal's property in trust or otherwise;
"(4) to disclaim a gift or devise of property to or for the benefit of the principal;
"(5) to create or change survivorship interests in the principal's property or in property in which the principal may have an interest. . . .;

18

"(6) to designate or change the designation of beneficiaries to receive any property, benefit or contract right on the principal's death." K.S.A. 58-654(f).

Again, the theory guiding our analysis dictates that when the language of a contract is clear, those words mark the end of any judicial inquiry regarding its meaning. The Legislature has distinctly stated that in accordance with this provision, an express grant of authority is required before an AIF is permitted to carry out any of the above enumerated tasks on the principal's behalf.

*Application of K.S.A. 58-654(f)*

Directing our attention to the precise linguistic dispute that brought the parties before us, we begin by considering the introductory paragraph for the DPOA in conjunction with its first numbered paragraph. The scope of their language is vast and contains several categories of authority, but of the actions listed, none address the authority to change or remove any of the beneficiaries that Curtis designated in his restated trust agreement. Accordingly, we are not persuaded that these two provisions move the needle toward Ryan's more particularized interpretation of the DPOA. K.S.A. 58-654(b) (A general power of attorney grants broad authority, encompassing all lawful acts that the principal could perform.). We are satisfied that these provisions convey nothing more to Ryan than broad, general powers.

The landscape is admittedly a tad less clear once we incorporate paragraph number (22) of the DPOA into our analysis. We are drawn to the language of that section that indicates Ryan's authority to establish a revocable trust is accompanied by the latitude to "convey any or all" of Curtis' estate into that trust. The word choice gives us pause as a fair reading of Curtis' restated trust agreement seemingly indicates that the majority, if not all, of his estate is already accounted for as the corpus of that instrument. Stated

19

another way, "all" of Curtis' estate is arguably already secured within his lawfully executed restated trust agreement.

Ryan encourages us to take a more generalized view of the phrase "establish a revocable trust." He contends that he merely resurrected the original revocable trust that Curtis executed in 2007 as the body of the SOT, therefore, "the entirety of Curtis' estate continued to be held in trust" at all times throughout the process. Accordingly, he did not run afoul of K.S.A. 58-654(f) and its requirement for an express statement of authority before an AIF can revoke their principal's trust. That is, according to Ryan, so long as the estate was merely shifted from one trust to another and not transferred to a wholly distinct testamentary instrument, then his conduct was lawful and above board in terms of Curtis' expectations when the DPOA was established. Ryan acknowledges that crafting an SOT that he deemed "proper and in Curtis' best interests" necessitated the revocation of certain "'provisions' of prior Trust documents" but asserts that because an *entire* trust instrument was not revoked, his actions were not the product of self-dealing and "Curtis was not left without a Trust," then his conduct was not impermissible.

Traci counters that while it is without question Ryan "had authority to institute or bring into existence a *new* trust agreement" he lacked any measure of authority to take any actions toward Curtis' trust that had already been in existence for several years. As support, Traci directs our attention back to Curtis' reservation of "'the absolute right and power to alter, amend or revoke'" his restated trust agreement.

This court considered a similar issue in *Muller*, where our court was asked to consider whether the broad, general powers granted to the AIF permitted them to withdraw all the trust's assets, which essentially resulted in a revocation of the trust. The trust instrument did not contain any language that either expressly allowed or prohibited the AIF from taking that course of action. This court, in citing the Bogert principle, held that unless the settlor expressly states otherwise in the trust instrument or the DPOA, the

20

power to revoke a trust is personal to the settlor and is nondelegable. 28 Kan. App. 2d at 143.

Similarly, we find persuasive the reasoning of courts that have addressed the analogous powers held by an AIF to revoke trusts created by the principal and to make gifts of the principal's property. These courts adhered to the principle that an AIF must be limited to performing only those powers expressly granted to them through the POA. See *Rice v. Novello*, 25 A.D.3d 992, 993, 808 N.Y.S.2d 486 (2006) (trust provision that stated "it could not be amended 'by an agent, a guardian or a conservator'" precluded effort by AIF to modify the trust); *In re Goetz*, 8 Misc. 3d 200, 205-06, 793 N.Y.S.2d 318 (N.Y. Surr. Ct. 2005) (finding AIF's attempt to amend revocable trust was "void and ineffective" as such acts were not expressly authorized in the trust document); *In re Guardianship of Lee*, 982 P.2d 539, 541-42 (Okla. Civ. App. 1999) (holding that an AIF did not have power to revoke his principal's revocable living trust when such power was specifically reserved to the principal in the trust instrument); *Weatherly v. Byrd*, 566 S.W.2d 292, 293 (Tex. 1978) ("[T]he right to revoke a revocable trust, absent an agreement to the contrary, is a purely personal right of the settlor and does not vest in [a] guardian."); *In re Rolater's Estate*, 542 P.2d 219, 223 (Okla. Civ. App. 1975) (A general POA "carries with it no authority to make a gift of the principal's property in the absence of an explicit direction.").

Because *Muller* predated our Legislature's drafting of the Act and the UPAA did not have a corresponding provision that required an express delegation of authority to amend, revoke, or otherwise modify an existing trust, our court turned to common law and extracted its legal authority from Bogert, The Law of Trusts and Trustees § 1000 at 322 (rev. 2d ed. 1983). *Muller*, 28 Kan. App. 2d at 140. The treatise directed that "unless the settlor expressly states otherwise in the trust document or the power of attorney, the power to revoke a trust is personal to the settlor and is nondelegable." 28 Kan. App. 2d at 143.

21

As we confront a similar issue, we now have the benefit of K.S.A. 58-654(f) as the standard that must be met. By way of refresher that subsection states that "[a]ny power of attorney . . . shall be construed to grant power or authority to an attorney in fact to carry out any of the actions described in this subsection only if the actions are expressly enumerated and authorized in the power of attorney." K.S.A. 58-654(f).

Ryan asserts that any inquiry under this subsection is unwarranted because execution of the SOT did not require him to stray beyond the broad general powers Curtis conveyed to him. That is, Curtis granted him the authority to establish a revocable trust for Curtis' benefit, under whatever terms Ryan deemed most appropriate. Ryan reasons that those limitations were necessarily honored because he simply resurrected Curtis' own initial 2007 trust instrument to serve as the SOT. However, Ryan then pivots to candidly acknowledge that his decision did involve the revocation of select aspects of Curtis' restated trust agreement, but claims it was necessary to adequately protect Curtis' interests. He highlights the fact that he successfully avoided revocation of the entire instrument, so the estate remained within a protective trust cocoon. Thus, no violation of K.S.A. 58-654(f)(1) occurred. Ryan likewise emphasizes that the SOT cannot be characterized as objectionable given that he did not execute it for purposes of personal gain.

Traci disagrees and argues that because Ryan's SOT effectively revoked Curtis' restated trust agreement, it is incumbent upon this court to determine whether Curtis expressly granted Ryan the authority required to affect the preexisting restated trust agreement. It is Traci's contention that we can resolve the issue by simply reviewing the terms of the DPOA in tandem with Curtis' restated trust agreement. She notes that doing so reveals that Curtis specifically reserved the sole authority to amend or revoke that instrument. As support for her analytical recommendation Traci directs us to *Skinner v. Skinner*, 126 Kan. 601, Syl. ¶ 1, 270 P. 594 (1928), *Place v. Place*, 207 Kan. 734, 739, 486 P.2d 1354 (1971), and *Rail Logistics, L.C. v. Cold Train, L.L.C.*, 54 Kan. App. 2d 98,

22

397 P.3d 1213 (2017). The theory articulated in those cases states that "'[w]here two instruments are executed by the same parties, at or near the same time, in the course of the same transaction, and concerning the same subject matter, they will be read and construed together, although they do not in terms refer to each other.'"

We find that both parties' proposed analyses technically miss the mark. While Ryan advocates for a determination that his actions are beyond the reach of K.S.A. 58-654(f) because only select portions of the trust were revoked, he fails to provide us with any authority to support his claim that piecemeal or strategic revocations are permissible, and the statutory provision certainly does not include such a distinction. Even if we did find Ryan's argument persuasive, the subsection requires an express grant of authority before an AIF can "execute, amend or revoke any trust agreement," "change survivorship interests in the principal's property," or "change the designation of beneficiaries." K.S.A. 58-654(f)(1), (f)(5), and (f)(6). Ryan neglects to offer any explanation for why his calculated modifications should not also be classified as violations of those other prohibited actions given the potential impact his SOT threatened to have on the inheritance rights of Traci and her children. His claim that a lack of self-dealing further insulates him from application of the provision is equally unpersuasive given the absence of any corresponding legal authority that self-serving conduct is the touchstone or catalyst necessary to trigger operation of the statute. While Curtis cites two California cases that involved self-serving conduct, *Schubert v. Reynolds*, 95 Cal. App. 4th 100, 115 Cal. Rptr. 2d 285 (2002), and *Pool-O'Connor v. Guadarrama*, 90 Cal. App. 5th 1014, 308 Cal. Rptr. 3d 1 (2023), neither holding can be interpreted to mean it is only when an AIF derives a personal benefit from acting beyond the scope of their authority that the conduct will be deemed impermissible. Accordingly, we are not persuaded that the authority Curtis conveyed to Ryan was broad enough to enable Ryan's SOT to withstand scrutiny under K.S.A. 58-654(f).

23

While the conditions under which Ryan executed the SOT are largely immaterial to resolution of the issue on appeal, we note that his argument nevertheless contains two fallacies that erect additional hurdles to the adoption of his position. First, his assertion that the SOT was merely a recreation of the initial trust Curtis executed in 2007 is not entirely accurate. Rather, according to the record, when Curtis finalized that original instrument, he expressed a clear intention for all three of his biological children to inherit his personal property, along with one-third each of the residuary estate, upon his passing. By contrast, the sole beneficiaries under Ryan's SOT are Curtis' biological daughters, Arin and Emma. He excluded Curtis' biological son, Quin, entirely. While Curtis ultimately reduced Quin's inheritance to a single payment of $100,000 in his final restated trust agreement, there is no indication he ever intended to wholly exclude his son from his estate plan.

Ryan further insists that his actions aligned with the DPOA because Curtis' best interests were the primary focus when he prepared the SOT. This claim is also belied by the record. According to Ryan, the SOT was a product of his desire "to protect Curtis' estate given the pending divorce action and Traci's conduct following Curtis' final hospitalization." While Curtis undeniably filed for divorce in September 2020, it is equally true that he told his lawyer shortly thereafter that he and Traci were attempting to reconcile and no longer pursuing a divorce. While the domestic case was never formally dismissed, it also never progressed beyond the initial pleadings and request for a temporary order. That is, it was a nonissue at the time the SOT was drafted. There is likewise no evidence to substantiate Ryan's claim that Traci and her son engaged in nefarious conduct at the marital residence while Curtis was hospitalized. It appears to be purely a matter of conjecture.

Curtis was very invested in ensuring that his estate plan modeled precision and clarity, as evidenced by the multiple times he honed it over the course of a decade. Yet, there is no indication from the record, and Ryan offers none, that Curtis ever pursued any

modifications in anticipation of the dissolution of his marriage. Curtis modified the trust agreement within a year of the couple's nuptials to ensure Traci was provided for in the event of his passing yet never took any corresponding steps to remove her when it appeared their marriage was falling apart. In our view, the formal steps to exclude her as a beneficiary are equally important to those taken to ensure she was properly positioned to inherit from his estate. In essence, Ryan urges us to conclude that despite Curtis' consistently meticulous approach to his estate plan, he was indifferent to the reality that his former spouse would be the beneficiary of a very generous portion of his estate and was equally apathetic toward the fact that she remained second in line to fulfill the role of his AIF, such that he did nothing to ensure neither event came to pass. Curtis never exhibited that disinterested disposition toward any other details in his estate plan; accordingly, we find Ryan's explanation unsupported and unreasonable.

We also are not persuaded that Traci's proposed path to resolution is the appropriate one. She asserts that because this case involves "'two instruments . . . executed by the same parties, at or near the same time, in the course of the same transaction, and concerning the same subject matter,'" it is appropriate to merely read and construe the DPOA and Curtis' restated trust agreement in tandem with one another. The Kansas Supreme Court has already made clear that the scope of authority conveyed to an AIF is to be discerned from the four corners of the DPOA specifically or "'the whole of the writing.'" *Bank IV Olathe*, 250 Kan. at 549 (quoting 3 Am. Jur. 2d, Agency § 30, pp. 533-35). When that assessment yields ambiguity, however, the inquiry may be expanded to include consideration of circumstances existing at the time the DPOA was drafted that may bear on the grantor's intent. 250 Kan. at 548-50; see also *In re Living Trust of Huxtable*, 243 Kan. 531, 533, 757 P.2d 1262 (1988) (where the language of a trust contains ambiguity, extrinsic evidence is permitted to establish the intent of the settlor). This approach aligns with that practiced in several other states. See *Davis v. Miller*, 576 P.3d 945, 951-52 (Okla. Civ. App. 2024) (The POA document was not sufficiently specific to grant Miller the express authority to "'create or change a beneficiary

25

designation'" as required by the statute.); *Malvern Operations, LLC v. Moss*, 605 S.W.3d 291, 294 (Ark. Ct. App. 2020) ("The nature and extent of the agent's authority must be ascertained from the power-of-attorney instrument itself."); *In re Estate of Collins*, 405 S.W.3d 602, 607 (Mo. Ct. App. 2013) ("'Absent ambiguity the intent of the maker of a legal instrument is to be ascertained from the four corners of the instrument without resort to extrinsic evidence.'"); *In re Estate of Romanowski*, 329 Ill. App. 3d 769, 776, 771 N.E.2d 966 (2002) (Contract interpretation follows the "'four corners'" doctrine, so the court looks only to the language of the contract to determine if it is susceptible to more than one meaning.).

We previously determined that the introduction and paragraph number (1) of Ryan's DPOA simply conveyed general powers and that paragraph number (22) produced a cloudier picture given that it allowed Ryan to "convey *any or all*" of Curtis' estate into a trust. (Emphasis added.) Even so, the words chosen for the remainder of that section do not specifically grant Ryan the authority to amend or revoke preexisting trust agreements, modify survivorship interests in Curtis' property, or change the beneficiaries designated to receive property or benefits upon Curtis' death, all of which Ryan's SOT endeavored to accomplish.

"'[A] contract is ambiguous when the words . . . may be understood to reach two or more possible meanings.'" *Mobile Acres, Inc. v. Kurata*, 211 Kan. 833, 838, 508 P.2d 889 (1973). While we will not strain to find ambiguity where, in common sense, there is none, for completeness we can address the issue assuming the language alone in paragraph number (22) of the DPOA lacks clarity, making it reasonably susceptible to either of the constructions advanced by the parties. *Greer v. Eby*, 309 Kan. 182, 192-93, 432 P.3d 1001 (2019).

A comprehensive assessment of the circumstances surrounding the evolution of the trust agreement and Curtis' execution of the DPOA reveals that beginning with the

initial version of the trust, it was Curtis' standard practice to include a revocability provision. In 2007, he specifically reserved "the right at any time or times to amend, alter, revoke or terminate this Trust, in whole or in part, or any provisions thereof." Five years later, when Curtis simultaneously executed a restated trust agreement and effectuated the DPOA, he reiterated his reservation of "the absolute right and power to alter, amend or revoke the Revocable Trust and this Trust Agreement at any time or from time to time, either in whole or in part, without the consent of the Trustee." That version of the instrument does include one section through which Curtis allowed modifications to be performed by someone other than himself, but only in very particular circumstances. Under subsection K. of Article XI's "Miscellaneous Provisions" he granted the trustee the authority to amend the trust but only as necessary "to ameliorate or avoid any tax consequences to the Trust or its beneficiaries which were unintended or unanticipated, or which are undesirable due to subsequent changes in tax laws," and only if such alterations do not result in tax consequences for the trustee. Thus, he exhibited an awareness of how to make that allowance when it was his desire to do so. Finally, and notably, the restated trust agreement makes clear that "[n]o guardian or other similar representative of the Grantor shall have the right or power to alter, amend or revoke the Revocable Trust or this Trust Agreement." The timing of Curtis' decision to include this precise language is compelling and arguably by design given that it was executed in tandem with the DPOA.

Curtis adjusted the terms of the trust agreement again eight months later when he prepared its first amendment so that Traci would receive an outright distribution of real property. He made clear that but for this minor alteration "all of the terms and conditions of Restated Trust Agreement of The Curtis F. Pfannenstiel Revocable Living Trust Agreement . . . shall remain in full force and effect." He expressed his intentions through identical language when he amended the instrument a second time five and a half years later. With each restatement and each amendment, Curtis expressly reserved the power to control any adjustments to the restated trust agreement.

27

The terms of Curtis' restated trust agreement regularly evolved for just over a decade. But the one constant, the singular issue that Curtis consistently ensured was clearly stated within each variant of the instrument, was that control over the modification or revocation of its terms belonged to him alone. Following a comprehensive review of the DPOA and careful scrutiny of its terms in conjunction with the history of Curtis' restated trust agreement, we are satisfied that the DPOA did not convey the degree of authority to Ryan that he claims Curtis transferred to him.

To be clear, it is not our position that an AIF is categorically prohibited from revoking a trust or select provisions contained therein, and this opinion should not be interpreted to stand for that proposition. We simply emphasize that when a grantor wishes to confer a level of authority that enables their AIF to carry out the tasks enumerated under K.S.A. 58-654(f), then they must also adhere to its directive and expressly state, in writing, that the AIF has the power to undertake those tasks on their principal's behalf. Ryan's DPOA did not contain the particularized language required to enable him to amend or revoke Curtis' restated trust agreement.

*Did the district court err in removing Ryan as trustee?*

Ryan also challenges the district court's removal of him as an alternate successor trustee from Curtis' restated trust agreement. He argues not only that his conduct fell far short of a serious breach of trust but also that the district court failed to make the requisite findings of fact to justify his removal. Traci responds, in part, by asserting that the issue is moot.

*Standard of Review*

The standard of review for removal of a trustee is abuse of discretion. See *In re Bradley Trust*, 60 Kan. App. 2d 66, 74, 490 P.3d 51 (2021). We recognize that the

28

"removal of a trustee is a drastic action which should only be taken when the estate is actually endangered and intervention is necessary to save trust property." *Jennings v. Murdock*, 220 Kan. 182, Syl. ¶ 12, 201, 553 P.2d 846 (1976). "A district court abuses its discretion if its action stems from an error or law or fact or is otherwise arbitrary or unreasonable." *In re Bradley Trust*, 60 Kan. App. 2d at 74. The party asserting the district court abused its discretion bears the burden of showing such abuse occurred. *Bicknell v. Kansas Dept. of Revenue*, 315 Kan. 451, 466, 509 P.3d 1211 (2022).

### *Additional Pertinent Facts*

In the original trust agreement from 2007, Curtis appointed himself as trustee, with Ken Beran and Ryan as successor trustees. When Curtis restated the trust agreement, he once again nominated Beran and Ryan as successor trustees but granted Traci the authority to appoint Beran, Ryan, or another trustee. The second amendment substituted Curtis' accountant, Rex Ball, for Beran but made no other adjustments.

The duty of the AIF is to act solely for the benefit of the principal in matters entrusted to him, and refrain from abusing the exposure their position might give them to particular things or information. See Restatement (Second) of Agency §§ 387-92 (1958).

### *Mootness*

Traci first contends that this issue is moot because the SOT, which named Ryan as a trustee, was declared "null and void." If the instrument that made Ryan a trustee had no legal force, her argument goes, then he was never capable of being removed as trustee.

Kansas appellate courts generally do not decide moot questions or render advisory opinions. See *State v. Montgomery*, 295 Kan. 837, 840, 286 P.3d 866 (2012). Rather, the role of a court is to "'determine real controversies relative to the legal rights of persons

29

and properties which are actually involved in the particular case properly brought before it and to adjudicate those rights in such manner that the determination will be operative, final, and conclusive.'" *State v. Hilton*, 295 Kan. 845, 849, 286 P.3d 871 (2012). To be a real, justiciable controversy, a case must involve definite and concrete issues and "adverse legal interests that are immediate, real, and amenable to conclusive relief." *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 890-91, 179 P.3d 366 (2008). The test for whether an issue is moot is well settled: "An appeal will not be dismissed as moot unless it clearly and convincingly appears that the actual controversy has ceased." *Montgomery*, 295 Kan. 837, Syl. ¶ 3. Whether a claim is moot presents a question of law over which we exercise unlimited review. See *Hilton*, 295 Kan. at 849.

We decline Traci's invitation to find that the controversy surrounding this issue no longer exists. Traci views this issue only through the lens of the SOT, but in the final version of Curtis' restated trust agreement, Curtis designated Ryan as a successor trustee and specified that he would be elevated to serve as trustee if Ball was unable to do so. Accordingly, it was Ryan's ability to serve neutrally in that role and honor his fiduciary obligations to Curtis with respect to Curtis' trust that the district court took issue with given the considerable bias he exhibited toward Traci through the SOT. There is no indication that version of Curtis' restated trust agreement has been revoked. Accordingly, we are unable to find this particular controversy has come to a close such that it should be dispensed with as moot.

*The district court did not err in removing Ryan as trustee.*

Turning to the merits, the district court concluded that it was necessary to remove Ryan as a trustee under the authority of K.S.A. 58a-706(b)(1) because he committed a breach of trust when he transcended the boundaries of his authority as an AIF and acted in direct contravention of the terms in Curtis' restated trust agreement when he executed the SOT. The district court found that removal was also appropriate under subsection

30

(b)(4) of that provision because a substantial change of circumstances occurred, his removal served the best interests of all beneficiaries, was consistent with the terms of the trust while not compromising the material purpose of the trust, and a suitable cotrustee or successor trustee remained readily available.

The crux of Ryan's abuse of discretion claim is that the district court relied on a series of factual missteps to arrive at its conclusion that Ryan's execution of the SOT rose to the level of a breach of trust. Relying on the comments following K.S.A. 58a-706, Ryan argues that a breach must be serious before removal of a trustee is warranted. We note that when offering an example of what type of conduct earns that label the drafters selected: when a trustee fails to keep the beneficiaries reasonably informed of the administration of the trust. The comment goes on to state that "[f]ailure to comply with this duty may make it impossible for the beneficiaries to protect their interests" and "may also mask more serious violations by the trustee." If failure to keep beneficiaries informed is considered a serious breach of trust because it hinders the beneficiaries' ability to protect their interests, then we have no hesitancy in concluding that an unauthorized removal of one's status as a beneficiary that risks destroying their interests in the trust likewise rises to the level of a serious breach. Ryan fails to carry his burden to show that the district court abused its discretion in finding that he committed a breach of trust under K.S.A. 58a-706(b)(1).

Ryan next asserts that the district court's decision regarding his removal must be reversed because it failed to make findings that a substantial change of circumstances occurred, as required by K.S.A. 58a-706(b)(4) before a removal may be effectuated. According to that provision, a court may remove a trustee if "there has been a substantial change of circumstances and the court finds that removal of the trustee best serves the interests of all of the beneficiaries, is consistent with the terms of the trust, is not inconsistent with a material purpose of the trust, and a suitable cotrustee or successor trustee is available." K.S.A. 58a-706(b)(4).

31

Traci counters that Ryan has waived this argument, as it is well established that when a party believes findings of fact are incomplete, that belief must be made known at the district court level so that the omission might be corrected. "Without an objection, omissions in findings will not be considered on appeal, and the district court is presumed to have found all facts necessary to support its judgment." *Gray v. Manhattan Med. Center, Inc.*, 28 Kan. App. 2d 572, 581, 18 P.3d 291 (2001).

The record before us bears out that Ryan filed a motion to alter or amend the district court's summary judgment order. In that motion, Ryan requested that the district court correct its factual findings concerning the gift of property made to Traci upon Curtis' death, in accordance with the terms of the first amendment to the restated trust agreement. Ryan also asked the district court to revisit the facts it relied upon concerning Curtis and Traci's divorce action. Notably, he did not implore the district court to make any additional or corrected findings for the substantial change of circumstances factor he seeks to challenge on appeal. By failing to object before the district court, Ryan has waived any claim that the requisite factual findings were not made when the district court ordered that he be removed as trustee. See *State v. Ballou*, 310 Kan. 591, 613-14, 448 P.3d 479 (2019) (when there is a failure to enter a contemporaneous objection at trial, we deem the issue waived or abandoned).

In his next claim of error, Ryan challenges the district court's conclusion that his removal best serves the interests of all the beneficiaries and is not inconsistent with the material purpose of the trust. With respect to the best interests finding specifically, he contends this lacks support in the record and is undermined by the fact that Arin and Emma would receive a greater benefit if designated the sole beneficiaries of Curtis' estate, as contemplated by Ryan's SOT. However, when the beneficiaries of the trust are considered together as a class, it is without question that removal of a trustee who endeavored to eliminate a majority of that class without authorization ultimately benefits

32

all beneficiaries. We are not persuaded that the district court abused its discretion in arriving at this conclusion.

The focus of Ryan's next issue is the district court's finding that Ryan's removal is consistent with the material purpose of the trust because Ryan prioritized Arin's and Emma's designation to the exclusion of other beneficiaries, as well as to the exclusion of Curtis, to whom Ryan owed a fiduciary obligation. The material purpose of the trust was to distribute Curtis' estate in a manner consistent with the terms of the trust that he deemed most advantageous for his beneficiaries. In addition to Arin and Emma, the restated trust agreement as amended directed that Quin, Traci, and Traci's children were also to receive benefits, and Ryan's SOT eliminated that inheritance opportunity for them entirely. Moreover, Curtis' inclusion of Beran and later Ball as potential successor trustees, and his decision to allow Traci to appoint the successor trustee, suggest that Curtis was not adamant that Ryan serve as his successor trustee. The record supports the district court's finding that Ryan's removal is not inconsistent with the material purpose of the trust.

Ryan directs our attention to the comment under K.S.A. 58a-706(b)(4) that suggests it has traditionally been more difficult to remove a trustee designated by the settlor than one placed by the court. While this may be accurate, as clarified by the above analysis, the statutory requirements for removal were met here, so any deference owed to Ryan would not change the outcome of this appeal.

Ryan next asserts that the district court should have afforded more consideration to what motivated him to execute the SOT, as that information is relevant to a determination of whether Ryan truly breached his fiduciary duty as an AIF, and whether removal of his designation as a successor trustee was legitimately warranted. As support, he reiterates his longstanding position that he simply wanted to protect Curtis' estate during a pending divorce proceeding and his serious health crisis. Again, the district court found that Ryan

"breached his fiduciary duty as attorney in fact, to act in good faith, to act prudently, to act in the principal's best interest and in accordance with the principal's instructions."

Traci responds that options were available for Ryan to secure Curtis' estate, without removing her and her children as lawful beneficiaries. She suggests that Ryan could have approached her about appointing a successor trustee and, to the extent he did not trust her judgment on that issue, he could have asked the district court to appoint himself or his father as an additional trustee or special fiduciary under K.S.A. 58a-704(e).

Traci offers the better argument. Curtis designated Ryan as his AIF which placed the obligation upon him to act in Curtis' best interests, rather than his own, and to do so without violating the sophisticated estate plan that Curtis spent years curating to his precise preferences. Regardless of whether either party sought to exploit Curtis' illness for personal gain, Ryan failed to act in accordance with Curtis' instruction and therefore breached his fiduciary duty.

Finally, Ryan argues that the district court placed undue weight on *Commerce Bank v. Posey*, No. 110,789, 2014 WL 4231298 (Kan. App. 2014) (unpublished opinion). There, the issue was whether an AIF was authorized to close bank accounts held in joint tenancy with rights of survivorship by the decedent and her friend. This court held that the decedent's AIF was not authorized to close the accounts because it effectively eliminated the friend's survivorship interest. 2014 WL 4231298, at *1.

Here, the district court briefly discussed *Posey* as an illustrative case to demonstrate that, when an AIF unilaterally acts to change beneficiaries without express authorization, the action is null and void. Ryan claims that the district court's reliance on *Posey* is inapt because that opinion did not include the language of the POA at issue and did not consider how a trustee's intent may factor into a determination that the trustee lacks authority to change a beneficiary designation.

34

While *Posey* does not include the exact language from the POA, it does discuss how that instrument granted the AIF general powers, and how that does not necessarily include the power to change the principal's beneficiary designations. 2014 WL 4231298, at *3-4. As for *Posey*'s lack of a discussion of the trustee's intent, that can be explained by the fact that K.S.A. 58a-706 does not include the trustee's intent as an element that the district court must consider when removing a trustee.

Consistent with K.S.A. 58a-706(b), our court has consistently recognized that the decision to remove a trustee lies within the sound discretion of the district court. *Jennings*, 220 Kan. at 211; *Rodriguez-Tocker v. Estate of Tocker*, 35 Kan. App. 2d 15, 34-35, 129 P.3d 586 (2006). As the party asserting error, Ryan bore the burden of establishing for us that an abuse of discretion occurred. See *Gannon v. State*, 305 Kan. 850, 868, 390 P.3d 461 (2017). Ryan failed to sustain his burden. While "[n]ot every breach of trust warrants removal of the trustee . . . , serious or repeated misconduct . . . may justify removal." Restatement (Third) of Trusts § 37, comment e (2003); see *Simpson v. Kansas Dept. of SRS*, 21 Kan. App. 2d 680, 688, 906 P.2d 174 (1995). After carefully reviewing the district court's decision, as well as the facts and arguments asserted by the parties, we concur with the district court's conclusion that the rather egregious circumstances of this case justified Ryan's removal as a successor trustee for Curtis' restated trust agreement.

Under this record, we find no question of fact for the jury to determine. And we find the uncontroverted facts are insufficient as a matter of law to sustain a finding that Ryan either possessed the authority required to modify Curtis' restated trust agreement, or would not pose a risk to the integrity of Curtis' estate plan should he be tapped to fill the role of successor trustee. Thus, the district court's decision granting summary judgment for Traci is affirmed.

Affirmed.